**ORIGINAL**

1  ABRAHAM, FRUCHTER
      & TWERSKY, LLP
2  IAN D. BERG   (Bar No. 263586)
   TAKEO A. KELLAR   (Bar No. 234470)
3  12526 High Bluff Drive, Suite 300
   San Diego, CA 92130
4  Tel:   (858) 792-3448
   Fax:   (858) 792-3449
5  iberg@aftlaw.com
   tkellar@aftlaw.com
6
   *Counsel for Lead Plaintiff Puerto Rico*
7  *Teachers Retirement System and Lead*
   *Counsel for the Class*
8

FILED
CLERK, U.S. DISTRICT COURT

DEC 2 0 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11  LARRY BROWN, Individually          Case No. CV 11-02559-MMM (PLAx)

12  and on Behalf of All Others        <u>CLASS ACTION</u>
    Similarly Situated,
13                                     CONSOLIDATED CLASS ACTION
14              Plaintiff,             COMPLAINT FOR VIOLATIONS
                                       OF THE FEDERAL SECURITIES
15          v.                         LAWS
                                       By Fax
16
    CHINA INTEGRATED ENERGY,
17  INC., et al.,                      DEMAND FOR JURY TRIAL
18
              Defendants.
19

20

21

22  RECEIVED
        BUT
23      NOT FILED

24      DEC 2 0 2011

25  CLERK, U.S. DISTRICT COURT
    CENTRAL DISTRICT OF CALIFORNIA
26  BY _____ DEPUTY

27

28

                          CONSOLIDATED CLASS ACTION COMPLAINT
                          Case No. CV 11-02559-MMM-PLA

1 | ABRAHAM, FRUCHTER
2 |   & TWERSKY, LLP
  | IAN D. BERG   (Bar No. 263586)
3 | TAKEO A. KELLAR   (Bar No. 234470)
  | 12526 High Bluff Drive, Suite 300
  | San Diego, CA 92130
4 | Tel:   (858) 792-3448
  | Fax:   (858) 792-3449
5 | iberg@aftlaw.com
  | tkellar@aftlaw.com
6 |
7 | Counsel for Lead Plaintiff Puerto Rico
  | Teachers Retirement System and Lead
  | Counsel for the Class
8 |

9 |                UNITED STATES DISTRICT COURT

10 |              CENTRAL DISTRICT OF CALIFORNIA

| LARRY BROWN, Individually | Case No. CV 11-02559-MMM (PLAx) |
|---|---|
| and on Behalf of All Others | |
| Similarly Situated, | CLASS ACTION |
| | |
| Plaintiff, | CONSOLIDATED CLASS ACTION |
| | COMPLAINT FOR VIOLATIONS |
| v. | OF THE FEDERAL SECURITIES |
| | LAWS |
| | By Fax |
| CHINA INTEGRATED ENERGY, | |
| INC., et al., | DEMAND FOR JURY TRIAL |
| | |
| Defendants. | |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 11-02559-MMM-PLA

ABRAHAM, FRUCHTER
   & TWERSKY, LLP
IAN D. BERG   (Bar No. 263586)
TAKEO A. KELLAR   (Bar No. 234470)
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 792-3448
Fax:   (858) 792-3449
*iberg@aftlaw.com*
*tkellar@aftlaw.com*

*Counsel for Lead Plaintiff Puerto Rico
Teachers Retirement System and Lead
Counsel for the Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY BROWN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHINA INTEGRATED ENERGY, INC., et al.,<br><br>Defendants. | Case No. CV 11-02559-MMM (PLAx)<br><br>**CLASS ACTION**<br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br>By Fax<br><br>DEMAND FOR JURY TRIAL |

# **TABLE OF CONTENTS**

Page

I.   NATURE OF THE ACTION..................................................................1

II.  NON-FRAUD AND FRAUD CLAIMS ..........................................6

III. JURISDICTION AND VENUE...........................................................7

IV.  THE PARTIES .....................................................................................7

V.   COMPANY BACKGROUND AND CORPORATE
     STRUCTURE....................................................................................13

VI.  SUBSTANTIVE ALLEGATIONS AND
     DEFENDANTS' MATERIAL
     MISREPRESENTATIONS AND OMISSIONS ...........................16

     A.   China Integrated's 2009 Financial Results Are
          Materially False And Misleading..........................................16

     B.   Defendants Made Materially False And
          Misleading Statements  About China
          Integrated's Biodiesel Production And Sales .....................23

     C.   Materially False Statements And Omissions
          Concerning Related Party Transactions...............................32

     D.   The False And Misleading Statements
          Artificially Inflated The Price Of China
          Integrated's Stock Allowing The Company To
          Raise Over $39.4 Million In The Secondary
          Offerings.................................................................................39

VII. THE TRUTH EMERGES ................................................................41

VIII. ADDITIONAL FACTS DEMONSTRATING
     FALSITY AND SCIENTER.............................................................45

     A.   NASDAQ Delisted The Company's Securities
          From Trading Due To The Seriousness Of
          China Integrated's Misconduct ...........................................45

     B.   Management's Refusal To Cooperate With The
          Investigation And Resignations In Connection
          With The Investigation Raise Strong Inference
          Of Scienter And Falsity........................................................47

     C.   KPMG's Resignation And Withdrawal Of Its
          Audit Opinion........................................................................48

     D.   The SEC Has Warned Of Reverse Merger
          Companies Such As China Integrated .................................49

IX.    THE PRESUMPTION OF RELIANCE ...........................................................52

X.     NO SAFE HARBOR.................................................................................53

XI.    CLASS ACTION ALLEGATIONS RELATING TO
       ALL CLAIMS .........................................................................................53

XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE
       ACT ......................................................................................................56

       COUNT I For Violation Of Section 10(b) Of The
           Exchange Act And Rule 10b-5 Promulgated
           Thereunder Against Defendants China
           Integrated, Gao, Pu, Li, And Goldman .............................................56

       COUNT II For Violation Of Section 20(a) Of The
           Exchange Act Against The Officer Defendants...................................58

XIII.  THE REGISTRATION STATEMENT AND
       PROSPECTUSES FOR THE SECONDARY
       OFFERINGS CONTAINED UNTRUE
       STATEMENTS OF MATERIAL FACT IN
       VIOLATION OF THE SECURITIES ACT ...................................................59

XIV.   CLAIMS FOR RELIEF UNDER THE SECURITIES
       ACT ......................................................................................................62

       COUNT III For Violation Of Section 11 Of The
           Securities Act Against All Defendants ...............................................62

       COUNT IV For Violation Of Section 15 Of The
           Securities Act Against The Officer Defendants...................................65

XV.    PRAYER FOR RELIEF ............................................................................66

XVI.   DEMAND FOR JURY TRIAL....................................................................66

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 11-02559-MMM-PLA

Lead Plaintiff Puerto Rico Teachers Retirement System ("Lead Plaintiff") and Plaintiff Bristol Investment Fund, Ltd. (collectively, "Plaintiffs") make the following allegations in this Consolidated Class Action Complaint ("Complaint") upon information and belief based upon all of the facts set forth herein, which were obtained through an investigation made by and through Lead Counsel. Lead Counsel's investigation has included, among other things, a review and analysis of filings by Defendants, as defined herein, with the United States Securities and Exchange Commission ("SEC"), press releases and other public statements issued by Defendants, investigation and analysis of Chinese State Administration of Industry and Commerce ("SAIC") filings, and the other sources set forth below. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the common stock of China Integrated Energy, Inc. ("China Integrated," "CBEH," or the "Company") between March 31, 2010 through April 21, 2011, (the "Class Period"), including persons or entities that purchased common stock pursuant and/or traceable to the Company's Registration Statement, effective May 19, 2010, and the Prospectuses issued in connection with the Company's Secondary Offerings on or about December 28, 2010 through January 7, 2011 (the "Secondary Offerings"), and who were damaged thereby.

2.    Defendant China Integrated operates in the People's Republic of China ("PRC" or "China") and purports to engage in the wholesale distribution of finished oil and heavy oil products, the production and sale of biodiesel fuel, and the operation of retail gas stations.

3.    During the Class Period, China Integrated reported record sales and growth, attributed, in part, to the product output and sales from its biodiesel

production factory in Tongchuan City, Shaanxi Province, PRC.  For example, in the Company's SEC filings, the Company reported sales in 2009 and 2010 of $55.8 million and $74.9 million, respectively, from its biodiesel fuel production – representing over 17% of the Company's total sales.

4.     In truth, however, Defendants materially overstated the Company's revenue and net income in its SEC filings, thereby misleading investors as to the Company's true financial condition.   Indeed, as alleged herein, the Company essentially maintained two sets of financial statements: (1) a presumably accurate set of financial records filed with Chinese regulators that are subject to substantial fines and serious criminal penalties in the PRC if the amounts are false, and (2) the false and misleading financial statements filed with the SEC, the U.S. regulator that essentially has no ability to enforce U.S. law over defendants who are insulated and "safe" in China.

5.     As compared to China Integrated's filings with the SAIC, the governing body that regulates industry and commerce in the PRC, China Integrated materially overstated the Company's sales revenues by 34% ($73.3 million), and net income by a staggering 29,510% ($37.7 million) in its 2009 financial statements on Form 10-K, filed with the SEC on March 31, 2010.

6.     In fact, the Company's revenues were a mere fabrication.  As revealed by a four-month investigation by a market analyst firm, which included video surveillance of the Company's 100,000-ton biodiesel factory in China, the Company's purported biodiesel production was a "complete hoax."   The investigation discovered *"no meaningful activity"* at the factory, which was contrary to Defendants' claims that the factory was running at full production.  During the entire four month surveillance, investigators witnessed only six tanker trucks entering and exiting the factory; and five of those trucks arrived on the same day that a group of investors toured the factory, staged by management to give those investors the appearance of activity at the factory.

7.     Furthermore, and contrary to Defendants' statements, the Company did not have purchase arrangements with certain local suppliers of raw materials which would have been necessary to produce the biodiesel fuel. This meant that China Integrated did not have an adequate supply of raw materials to produce the amounts of biodiesel it claimed to be producing.

8.     In addition to inflating the Company's sales and revenues in its SEC filings, China Integrated failed to disclose and improperly accounted for related-party transactions in violation of Generally Accepted Accounting Principles ("GAAP"), whereby the Company purchased a 50,000-ton biodiesel factory (the "Chongqing Tianrun factory") and a gas station (the "Shenmu gas station") in October 2010 that were owned, in part, by the son of the Company's Chief Executive Officer, Defendant Xincheng Gao. These undisclosed related-party transactions allowed China Integrated to improperly funnel millions of dollars of the Company's money to Defendant Gao's son without informing investors.

9.     Defendants' fraudulent scheme allowed the Company *to raise over $39.4 million* through the sale of common stock, each at the inflated price of $7.00 per share, in the Secondary Offerings.

10.     On March 16, 2011, analyst firm Sinclair Upton published a detailed, 44-page report (the "Sinclair Upton Report"), on China Integrated exposing, *inter alia*, that: (i) China Integrated, through its main operating subsidiary Xi'an Baorun Industrial Development Co., Ltd. ("Xi'an Baorun Industrial"), reported significantly lower revenues, fixed assets and net income for 2008 and 2009 in its SAIC financial statements, as compared to the overstated amount claimed in the Company's 2009 Form 10-K filed with the SEC; and (ii) Defendants had been funneling money to corporations owned by Defendant Gao's son through the acquisitions of the Chongqing Tianrun factory and the Shenmu gas station.

11.     In reaction to the Sinclair Upton Report, China Integrated's stock price fell nearly 16% ($0.95 per share) on March 16, 2011. The next day, analysts

at Roth Capital Partners downgraded the stock and confirmed that the *"[S]AIC data presented in the [Sinclair Upton Report] is consistent with the information we obtained independently."* As a result, the Company's stock fell another 24.6% ($1.23 per share).

12.     On March 23, 2011, the Company issued a letter to shareholders (the "Rebuttal") purporting to respond to the allegations in the Sinclair Upton Report. Among other things, the Company vigorously denied that it had made any misstatements in its financial statements and SEC filings, and denied all of the other accusations in the Sinclair Upton Report.   The Company referenced boilerplate rhetoric of the purportedly "well-known fact that there is rare consistency between Chinese SAIC filings and U.S. SEC filings" and "differences in accounting treatment between Chinese accounting standards and U.S. GAAP," but did not explain how these differences would account for the significant discrepancies *of over $37 million* between the net income reported in the SAIC filings and the Company's SEC filings.

13.     In its Rebuttal, the Company also denied the related party transactions, despite the SAIC information showing that Defendant Gao' son had ownership interests in the Chongqing Tianrun factory and the Shenmu gas station prior to the acquisitions by the Company.

14.     Further details of Defendants' fraudulent scheme were revealed to the market on March 28, 2011, when analyst firm Alfred Little issued a detailed report on China Integrated (the "Alfred Little Report") calling the Company *a "complete hoax"* based on, among other things, its review and analysis of the Company's SAIC filings and 2009 Chinese "audited" financial statements by its Chinese auditor, Zhongrui Yuehua Certified Public Accountants, and *on-site and video surveillance* of the 100,000-ton Tongchuan biodiesel factory and the Chongqing Tianrun biodiesel factory.   The Alfred Little Report revealed, *inter alia*, that "[f]our months [of] nearly continuous on site observation and video surveillance of

CBEH's biodiesel operations [...] confirm[ed] *no meaningful production activity*" and that investigators had filmed management "*staging phony production activity at the factory.*"

15.    In the wake of these revelations, the Company announced on April 5, 2011, that it had retained the law firm of Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury Winthrop"), the accounting firm of Deloitte Financial Advisory Services LLP ("Deloitte"), and the law firm King & Wood, to advise the Company's Audit Committee in connection with an internal investigation into the allegations set forth in the Sinclair Upton Report and the Alfred Little Report.

16.    Just a few weeks later, on April 27, 2011, the Company announced that: (a) its chairman of the Audit Committee, Defendant Larry Goldman, had resigned due to management's *unwillingness to cooperate* with Pillsbury Winthrop, Deloitte and King & Wood in connection with the internal investigation; and (b) Pillsbury Winthrop, Deloitte and King & Wood has also resigned from the internal investigation.  The Company's Chief Financial Officer, Defendant Alfred Pu, and another member of the Audit Committee, Defendant Wenbing Christopher Wang, also resigned from the Company.

17.    The revelations and internal investigation of Defendants' fraudulent scheme also resulted in the resignation of KPMG as the Company's independent auditor, after only just over four months of service.  KPMG's resignation letter notified the Company and investors that KPMG's audit report and internal controls opinion filed with the Company's 2010 Form 10-K on March 16, 2011, should no longer be relied upon, and that KPMG's resignation was due to the "inconsistency between management's representation to [KPMG] that it will fully cooperate with the special investigation requested and authorized by the Audit Committee and the manner of management's conduct during the investigation raises doubts about management's representations provided to us in connection with our 2010 audits of

1   the consolidated financial statements and the effectiveness of internal control over

2   financial reporting of the Company."

3   18.   Further, as a result of the revelation of the Company's fraud and false

4   and misleading financial statements, the NASDAQ stock market halted trading of

5   the Company's stock after the close of trading on April 20, 2011, at the closing

6   price of $1.84 per share.  The NASDAQ stated in an announcement that "[t]rading

7   will remain halted until China Integrated Energy, Inc. has fully satisfied

8   NASDAQ's request for additional information" concerning the allegations – which

9   the Company could not do.

10   19.   Ultimately, the NASDAQ delisted the Company from trading on the

11   exchange on November 21, 2011.  Following a review of information provided by

12   China Integrated, the NASDAQ disclosed that listing of China Integrated's

13   common stock was "no longer warranted" due to "public interest concerns"

14   including "the Company's obstruction of the board's independent investigation

15   into the recent allegations made by various individuals."

16   **II.   NON-FRAUD AND FRAUD CLAIMS**

17   20.   In this Complaint, Plaintiffs assert two different sets of claims.  In the

18   first set of claims (Counts I and II), Plaintiffs assert fraud-based claims under the

19   Securities Exchange Act of 1934 (the "Exchange Act") against Defendants who are

20   alleged to have directly participated in a fraudulent scheme and made materially

21   misleading statements and omissions throughout the Class Period, and who acted

22   with knowledge or deliberate reckless disregard of the true facts.

23   21.   In the second set of claims (Counts III and IV), Plaintiffs assert strict

24   liability and negligence claims based on the Securities Act of 1933 (the "Securities

25   Act").  These claims are asserted against those Defendants who are statutorily

26   responsible for material misstatements of facts and omissions in the prospectuses

27   and registration statements pursuant to which China Integrated common stock was

28

offered to the public in the Secondary Offerings.  Plaintiffs specifically disclaim any allegations of fraud in connection with these non-fraud claims.

## III.   JURISDICTION AND VENUE

22.   Counts I and II asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  Counts III and IV claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

23.   This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

24.   Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C §1391.   Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

25.   In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchanges.

## IV.   THE PARTIES

### A.   Plaintiffs

26.   Lead Plaintiff Puerto Rico Teachers Retirement System ("Puerto Rico TRS" or "Lead Plaintiff") purchased China Integrated common stock during the Class Period and has suffered damages as a result.   Lead Plaintiff's PSLRA Certification has previously been filed with the Court and is incorporated herein by reference.

27.     Plaintiff Bristol Investment Fund, Ltd. ("Bristol Investment"), as set forth in its PSLRA Certification previously filed with the Court, which is incorporated herein by reference, bought 142,858 shares of China Integrated common stock in one of the Secondary Offerings pursuant to the Registration Statement and Supplemental Prospectus, and suffered damages as a result of the false statements contained therein.

### B.     Defendant China Integrated Energy, Inc.

28.     Defendant China Integrated Energy, Inc. ("China Integrated," "CBEH," or the "Company") purports to engage in the wholesale distribution of finished oil and heavy oil products, the production and sale of biodiesel fuel, and the operation of retail gas stations.  The Company maintains its principal executive offices at Dongxin Century Square, 7th Floor, Hi-Tech Development District, Xi'an Shaanxi Province, PRC.  During the Class Period, the Company's common stock was actively traded on the NASDAQ stock market under the ticker "CBEH." The NASDAQ halted trading of the stock on April 20, 2011, and then suspended trading on June 15, 2011.  On November 10, 2011, the NASDAQ removed China Integrated's common stock from listing and registration on the NASDAQ.

### C.     The Officer Defendants

29.     Defendant Xincheng Gao ("Gao") was at all relevant times Chief Executive Officer ("CEO") and President of China Integrated.  Defendant Gao owned 64.9% of the Company's common stock, through Redsky Group Limited, which he controls, as of October 6, 2010 (as disclosed in the Company's Proxy Statement for the 2010 Annual Meeting of Stockholders).  Defendant Gao is also employed as the chairman of Xi'an Baorun Industrial.  During the Class Period, Defendant Gao signed and certified China Integrated's SEC filings pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), including, without limitation, the Company's annual reports for 2009 and 2010 on Forms 10-K, and the Company's quarterly reports for the first, second, and third quarters of

2010 on Forms 10-Q. In addition, Defendant Gao signed the Company's Registration Statement on Form S-3 in connection with the Secondary Offerings.

30. Defendant Albert C. Pu ("Pu") was at all relevant times Chief Financial Officer ("CFO") of China Integrated. Defendant Pu has over 21 years of financial management, accounting, and audit experience, and has a B.S. in Accounting from the State University of New York, Institute of Technology in 1990. Defendant Pu is a New York State Certified Public Accountant. Defendant Pu also was employed as the CFO of Xi'an Baorun Industrial. During the Class Period, Defendant Pu signed and certified China Integrated's SEC filings pursuant to SOX, including, without limitation, the Company's annual reports for 2009 and 2010 on Forms 10-K, and the Company's quarterly reports for the first, second, and third quarters of 2010 on Forms 10-Q. In addition, Defendant Pu signed the Company's Registration Statement in connection with the Secondary Offerings. Defendant Pu resigned from the Company on April 28, 2011.

31. Defendant Gaihong Li ("Li") was at all relevant times the Company's Financial Controller and Executive Vice President, and also served as a director of the Company. Defendant Li also served as the Financial Controller and Executive Vice President of Xi'an Baorun Industrial. During the Class Period, Defendant Li signed the Company's annual reports for 2009 and 2010 on Forms 10-K. In addition, Defendant Li signed the Company's Registration Statement in connection with the Secondary Offerings.

32. Because of their positions with the Company, Defendants Gao, Pu and Li (herein, the "Officer Defendants") each possessed the power and authority to control the contents of the Company's annual reports, quarterly reports, press releases, and presentations to securities analysts and investors. They were provided with copies of the Company's SEC filings and press releases alleged to be misleading prior to, or shortly after their issuance; and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of

their positions with the Company, and their access to material non-public information, the Officer Defendants knew that the adverse facts specified herein were being concealed from the public, and that the representations being made were then materially false and misleading.

33.    As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Officer Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based on truthful and accurate information. The Officer Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.   The Officer Defendants are therefore liable for the false and misleading statements pleaded herein.

**D.    The Director Defendants**

34.    Defendant Larry Goldman ("Goldman") was at all relevant times a director of the Company. Defendant Goldman also served as the Chairman of the Company's Audit Committee. Defendant Goldman is a certified public accountant with over 25 years of auditing, consulting and technical experience and since October 2007 works as a consultant providing CFO support to various US listed public companies.  According to the Company's SEC filings, Defendant Goldman has extensive experience in both auditing and consulting with public companies, and has experience providing accounting and consulting services to the Asian marketplace for almost 10 years, having also audited several U.S.-listed Chinese public companies.

35.    At all relevant times, the Company's Board of Directors designated Defendant Goldman as the "audit committee financial expert" pursuant to the SEC's rules and regulations, including Item 407(d)(5) of Regulation S-K, which meant that the Company's Board of Directors determined that Defendant Goldman had the following attributes:

(a)    An understanding of generally accepted accounting principles and financial statements;

(b)    The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;

(c)    Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;

(d)    An understanding of internal control over financial reporting; and

(e)    An understanding of audit committee functions.

36.    Defendant Goldman signed the Company's Registration Statement in connection with the Secondary Offerings.  Defendant Goldman also signed the 2009 Form 10-K incorporated by reference in the Registration Statement and Prospectuses for the Secondary Offerings, and signed the 2010 Form 10-K. Defendant Goldman resigned from the Board of Directors on April 21, 2011.

37.    Defendant Wenbing Christopher Wang ("Wang") was at all relevant times a director of the Company and member of the Audit Committee.  Defendant Wang signed the Company's Registration Statement in connection with the Secondary Offerings.   Defendant Wang also signed the 2009 Form 10-K

incorporated by reference in the Registration Statement and Prospectuses for the Secondary Offerings.  Defendant Wang resigned from the Board of Directors on May 3, 2011.

38.    Defendant Junrong Guo ("Guo") was at all relevant times a director of the Company and member of the Audit Committee.  Defendant Guo signed the Company's Registration Statement in connection with the Secondary Offerings. Defendant Guo also signed the 2009 Form 10-K incorporated by reference in the Registration Statement and Prospectuses for the Secondary Offerings.

39.    As members of the Audit Committee, according to the Audit Committee's Charter, Defendants Goldman, Wang and Guo had the responsibility to "review and be responsible for, among other things, the Company's system of internal controls, its financial reporting process, the audit process, and the Company's processes for monitoring compliance with laws and regulations."  In addition, in connection with the annual audit of the Company's financial statements, the Audit Committee members had the responsibility to:

> [R]eview with management and the independent auditors the results of the audit, the audit report, the management letter relating to the audit report, all significant questions (resolved or unresolved) that arose and all significant difficulties that were encountered during the audit, the disposition of all audit adjustments identified by the independent auditors, all significant financial reporting issues encountered and judgment made during the course of the audit (including the effect of different assumptions and estimates on the financial statements) and the cooperation afforded or limitations (including restrictions on scope or access), if any, imposed by management on the conduct of the audit; [and]
>
> review, prior to filing, all annual reports on Form 10-K and all quarterly reports on Form 10-Q, to be filed with the SEC. Discuss

with management and the independent auditors, where practicable, prior to filing, the financial statements (including the notes thereto) and the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

40.    Herein, Defendants Goldman, Wang, and Guo, along with Defendants Gao and Li, are referred to collectively as the "Director Defendants."

### E.    Defendant Sherb & Co.

41.    Defendant Sherb & Co. ("Sherb"), a certified public accounting firm, served as China Integrated's independent auditor prior to being dismissed from that capacity on December 16, 2010.   Defendant Sherb audited and certified the Company's 2009 consolidated financial statements filed with the SEC on March 31, 2010, on Form 10-K, which was incorporated by reference with Defendant Sherb's permission, in the Registration Statement and Prospectuses for the Secondary Offerings.

## V.    COMPANY BACKGROUND AND CORPORATE STRUCTURE

42.    Defendant China Integrated operates in the PRC and purportedly engages in three business segments: (1) the wholesale distribution of finished oil and heavy oil products; (2) the production and sale of biodiesel fuel; and (3) the operation of retail gas stations.

43.    According to the Company's SEC filings, China Integrated operates its business in the PRC through certain contractual agreements between Redsky Industrial Co., Ltd. ("Redsky Industrial") and Xi'an Baorun Industrial.   Redsky Industrial is an indirect wholly-owned subsidiary of China Integrated that is registered in the PRC.   Xi'an Baorun Industrial is based in Xi'an, Shaanxi Province, PRC and owned by three Chinese citizens, including Defendant Gao, who owns a 70% equity interest in Xi'an Baorun Industrial.

44.    According to the Company's SEC filings, "[i]n order to meet domestic ownership requirements under PRC law, which restricts foreign

companies from operating in the finished oil and biodiesel industry, Redsky Industrial executed a series of exclusive contractual agreements with Xi'an Baorun Industrial, which allow [China Integrated], among other things, to secure significant rights to influence Xi'an Baorun Industrial's business operations, policies and management, to approve all matters requiring stockholder approvals, and give [China Integrated] the right to include 100% of the annual net income earned by Xi'an Baorun Industrial as part of [China Integrated's] consolidated financial statements."

45.    The Company also indicated in its 2009 Form 10-K filed with the SEC that "[s]ince Baorun Group owns Redsky Industrial, which effectively controls Xi'an Baorun Industrial, Xi'an Baorun Industrial is deemed a subsidiary of Baorun Group, which is our legal subsidiary.. . . Under FIN 46(R), Xi'an Baorun Industrial is to be presented as our consolidated subsidiary."

46.    According to China Integrated's SEC filings, the following diagram illustrates China Integrated's corporate structure:



47.    In order to have its stock publicly traded in the United States and gain access to U.S. equity investors, China Integrated employed a device called a "reverse merger" in 2007.  In a reverse merger, a publicly traded shell company acquires the private company seeking to go public.  In exchange, the shareholders of the former private company receive a controlling share of the public company.

48.    Here, the "shell company" was incorporated in the State of Delaware in July 1998 under the corporate name "A.M.S. Marketing, Inc." In October 2003, the shell company changed its name to "International Imaging Systems, Inc." Until January 2007, the shell company was engaged in the business of marketing pre-owned, brand name photocopy machines and employee leasing.

49.    Leading up to the reverse merger, China Integrated acquired Baorun China Group Limited ("Baurun Group") pursuant to a Share Exchange Agreement dated October 23, 2007, between Baorun Group, Redsky Group Limited and Princeton Capital Group LLP. Defendant Gao is the sole director, officer and stockholder of Redsky Group Limited and has sole voting and dispositive power over the shares owned by Redsky Group Limited. Together, Redsky Group Limited and Princeton Capital Group LLP owned shares constituting 100% of the issued and outstanding ordinary shares of Baorun Group.

50.    Pursuant to the terms of the Share Exchange Agreement, Redsky Group Limited and Princeton Capital Group transferred all of their shares in Baorun Group in exchange for the issuance of the shell company's (International Imaging Systems, Inc.) common stock. As a result of this share exchange, Baorun China Group Limited became International Imaging Systems, Inc.'s wholly owned subsidiary, and Redsky Group and Princeton Capital Group acquired an aggregate of approximately 94.11% of International Imaging Systems, Inc.'s common stock.

51.    On November 15, 2007, through a merger of a wholly owned subsidiary, the Company's corporate name was changed from "International Imaging Systems, Inc." to "China Bio Energy Holding Group Co., Ltd." Finally, on September 17, 2009, the Company's name was changed to "China Integrated Energy, Inc."

## VI.   SUBSTANTIVE ALLEGATIONS AND DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

### A.   China Integrated's 2009 Financial Results Are Materially False And Misleading

52.   The Class Period begins on March 31, 2010, when the Company filed with the SEC its financial results for the fiscal year 2009 on Form 10-K (the "2009 10-K") containing false and misleading financial statements.  As detailed below, the 2009 10-K materially overstated the Company's revenues and net income.

53.   The false and misleading 2009 10-K was signed by Defendants Gao, Pu, Li, and Goldman.  In addition, attached as exhibits to the 2009 10-K were the certifications of Defendants Gao and Pu made pursuant to §302(a) of SOX ("Sox Certification"), in which Defendants Gao and Pu each certified the accuracy of China Integrated's financial statements as follows:

(1) I have reviewed this Annual Report on Form 10-K of China Integrated Energy, Inc. (the "Registrant");

(2) Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact* necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition*, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

(4) The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal

control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. evaluated the effectiveness of Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

(5) The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls over financial reporting.[1]

54.     In addition, attached to the 2009 10-K was the § 906 Sox Certification of Defendants Gao and Pu, which, in pertinent part, provides that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of the operation of the Company."

55.     The 2009 10-K was materially false and misleading when made because it falsely overstated China Integrated's revenue and net income for 2009. In truth, the primary Chinese operating subsidiary of China Integrated, Xi'an Baorun Industrial, reported significantly lower revenues and net income than was accurately reported in Chinese regulatory filings.

56.     The State Administration for Industry and Commerce ("SAIC") is the Chinese governing body that regulates industry and commerce in China.  It is primarily responsible for business registration and licensing, and acts as the government supervisor of corporations.  All Chinese companies are required to file financial statements with the SAIC annually.  *See* Articles 3, 5 and 7(5), Order of the State Administration for Industry and Commerce, No. 23, The Measures for the Annual Inspection of Enterprises (promulgated on Feb. 24, 2006).

57.     Lead Counsel obtained copies of Xi'an Baorun Industrial's SAIC filings from the Administration for Industry and Commerce for the Shaanxi

---

[1] Unless otherwise indicated, all emphasis is added.

Province, where the primary subsidiary of China Integrated is located.  The SAIC filings for 2009 were signed by Defendant Gao.

58.   Notably, the SAIC filings obtained by Lead Counsel corroborate the reports of multiple analysts, as set forth herein, showing a great disparity between the Company's SEC and SAIC filings.  In particular, the analysts in the Sinclair Upton Report, dated March 16, 2011, first alerted the market of the overstated revenues in the SEC filings when compared to the SAIC filings.  Analysts at Roth Capital Partners noted in a report published on March 17, 2011, that they had independently obtained the SAIC filings referenced in the Sinclair Upton Report, and reported that the "[S]AIC data presented in the third-party report is consistent with the information we obtained independently."

59.   As demonstrated in the chart below, as compared to the Company's SAIC filings, the Company's 2009 10-K financial reports materially overstated: (a) the Company's sales revenue, by $73.3 million (34%); (b) costs of goods sold, by $43.1 million (21%); (c) income from operations, by $37.4 million (18,786%); and (d) net income, by $37.7 million, by *a staggering 29,510%*:[2]

| | 2009 SAIC Filings | | 2009 10-K | Overstated Amount In 2009 10-K | |
|---|---|---|---|---|---|
| | (RMB) | (USD) | (USD) | (USD) | (%) |
| Sale Revenue | 1,474,844,527 | $216,226,956 | $289,572,053 | $73,345,097 | 34% |
| Cost of goods sold | 1,397,992,312 | $204,959,653 | $248,101,339 | $43,141,686 | 21% |
| Income from operations | 1,359,749 | $199,353 | $37,650,541 | $37,451,188 | 18,786% |
| Net Income | 872,385 | $127,900 | $37,870,963 | $37,743,063 | 29,510% |

---

[2] According to the 2009 10-K, "[r]evenues and expenses are translated at the average rate of exchange prevailing during the reporting period."  The average yearly exchange rate for 2009 of RMB 1 = USD $0.14661 is applied herein and amounts rounded to the nearest dollar.

60.   The Company's revenues, costs of goods sold, income from operations, and net income reported in the Company's 2009 10-K were false and misleading when made because the SEC filings are drastically different from the true financial performance of the Company, as reflected in the Chinese SAIC filings.

61.   Under Chinese law, penalties for filing false SAIC filings include fines and revocation of the entity's business license. *See* Article 76, Regulations of the People's Republic of China on Administration of Registration of Companies (promulgated on Dec. 18, 2005) and Article 20, Order of the State Administration for Industry and Commerce, No. 23, The Measures for the Annual Inspection of Enterprises (promulgated on Feb. 24, 2006).

62.   If an entity's business license is revoked, the People's Bank of China, which is the equivalent to the Federal Reserve in the U.S., requires the bank account of the entity to be closed. *See* Article 49, Order of the People's Bank of China No. 5, "Administrative Rules for RMB Bank Settlement Accounts," April 10, 2003. Without a business license the entity cannot legally conduct business in the PRC. *See* Article 10 of the "Enforcement Opinion of the State Administration for Industry and Commerce on Some Issues concerning Enterprise Registration and Management," SAIC (1999) No. 173; "Reply of the State Administration for Industry and Commerce concerning the Issue of Legal Personality after the Revocation of the License of an Enterprise Legal Person," SAIC (2002) No. 106.

63.   The falsity of the reported net income reported in the 2009 10-K is corroborated by the report of analysts at Alfred Little issued on March 28, 2011 (defined above as the "Alfred Little Report"). The Alfred Little Report includes a link to a copy of the Xi'an Baorun Industrial's 2009 Chinese audited financial statements purportedly audited by Zhongrui Yuehua Certified Public Accountants,

Shaanxi Branch, one of the largest Chinese audit firms in the PRC.[3]   The Company's 2009 Chinese audited financials also reported significantly lower net income of 42,551,641.77 RMB or $6,238,496 USD, which was $31.6 million less than reported in the 2009 10-K filed with the SEC.  Under PRC law, filing false financial and accounting reports and tax documents is subject to severe criminal and civil penalties, including imprisonment.  *See* Article 201, Criminal Law of the PRC (promulgated on March 14, 1997); Articles 13, 43 and 45 of the Accounting Law of the PRC (amended on October 31, 1999).

64.   Moreover, the Company did not have any legitimate reason to understate their SAIC filings to avoid paying taxes in China given that the Company stated in the 2009 10-K that Xi'an Baorun Industrial "obtained approval from the PRC tax authority for the exemption of income taxes from 2004 to the end of 2010 as the incentive from the Government for bio energy products." Further, according the Company's 2010 10-K, Xi'an Baorun Industrial "has enjoyed exemption of the corporate income tax for all three business segments." But, according to the Xi'an Baorun Industrial SAIC income statements, the Company did pay 290,794.91 RMB, or $42,633.44 USD, in corporate income tax to the Chinese government for 2009.   Applying the Chinese government's corporate income tax rate of 25% to this amount implies that the Company's income before taxes was $170,534 USD for 2009, which is significantly lower than the claimed $37,870,963 USD net income reported in the 2009 10-K.

65.   In addition, although the Company claimed the tax exemption, the Alfred Little Report detailed that investigators "contacted local tax bureau officials who confirmed [Xi'an Baorun Industrial] is ***not exempt*** from income tax" and based on the "Xi'an Baorun Industrial's Chinese 2009 audited financials, Baorun's income tax rate is 25%."

---

[3] Available at http://labemp.files.wordpress.com/2011/03/cbeh-2009-partially-translated-chinese-audited-financial-report.pdf (last visited December 1, 2011).

66.     The Company's false claim of the income tax exemption in the 2009 10-K and the reported taxes paid as reflected in the SAIC filings, further supports the allegations that Company reported false and significantly inflated net income in China Integrated's 2009 10-K.

67.     In response to the Sinclair Upton Report, the Company issued its Rebuttal on March 23, 2011 asserting that the inconsistencies between the Chinese and SEC filings were attributable to the purportedly "well-known fact that there is rare consistency between Chinese SAIC filings and U.S. SEC filings" and "differences in accounting treatment between Chinese accounting standards and U.S. GAAP."

68.     The unexplained differences in the Chinese and U.S. accounting principles, however, do not account for the vast discrepancies between the China Integrated's reported revenue and net income to the SEC and the revenue and net income reported in the Company's SAIC filings.  As explained above, filing false SAIC filings can result in fines and even criminal penalties under Chinese law, and can result in the revocation of the company's business license, which may render the business unable to maintain a bank account or legally conduct business in China.  Whereas, the SEC has no ability to enforce violations of U.S. laws over China Integrated's business operations domiciled in the PRC.  For example, an article in *Barron's* by Bill Alpert and Leslie P. Norton entitled, "Beware This Chinese Export," discusses the enforcement problems that American regulators face when dealing with Chinese companies that trade on U.S. Exchanges, such as China Integrated.  The articles notes that "[t]he SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S."

**B.    Defendants Made Materially False And Misleading Statements About China Integrated's Biodiesel Production And Sales**

69.    China Integrated's biodiesel production and sales division, one of the three segments of the Company's business operations, purportedly accounted for 19.3% (or $55.8 million) of the Company's total reported sales in 2009 and 17.1% (or $74.9 million) of the Company's total reported sales in 2010, according to the 2009 10-K and the 2010 10-K, respectively.   The biodiesel production was purportedly produced through Xi'an Baorun Industrial's operations of a biodiesel production factory located in Tongchuan City, Shaanxi Province, with "an annual design capacity of 100,000 tons" (the "Tongchuan factory"), according to the 2009 10-K.

70.    As detailed below, however, throughout the Class Period, Defendants falsified the sales and production of biodiesel reported in the Company's SEC filings, thereby misleading investors as to the true financial condition of the Company.

**The False And Misleading Statements Concerning Biodiesel Sales And Production**

71.    The 2009 10-K, filed on March 31, 2010, stated that "[f]or the year ended December 31, 2009, *sales from production and sales of biodiesel was $55.8 million* compared to $50.0 million in the same period of 2008.  The sales volume of production and sales of biodiesel *increased by 9,700 ton* or 13.9% from the same period in 2008."  As set forth above, the false and misleading 2009 10-K was signed by Defendants Gao, Pu, Li, and Goldman, and Defendants Gao and Pu signed the accompanying SOX certifications, attesting to the accuracy of the 2009 10-K.

72.    On May 13, 2010, the Company filed with the SEC its financial results for the first quarter of 2010, for the period ended March 31, 2010, on Form 10-Q ("1Q 10-Q").   With respect to biodiesel production and sales from the

1  100,000-ton Tongchuan biodiesel factory, the 1Q 10-Q stated that "[s]ales from

2  production and sale of biodiesel segment for the three months ended March 31,

3  2010 was *[$]14.9 million*, compared to $11.3 million in the same period of 2009.

4  Sales volume of biodiesel for the three months ended March 31, 2010 and 2009

5  were *18,400 tons* and 17,300 tons, respectively, with *a[n] increase[] of 1,100 tons*

6  or 6.4%, compared to the same period of 2009."

7      73.   On August 13, 2010, the Company filed with the SEC its financial

8  results for the second quarter of 2010, for the period ended June 30, 2010, on Form

9  10-Q ("2Q 10-Q").   With respect to biodiesel production and sales from the

10  100,000-ton Tongchuan biodiesel factory, the 2Q 10-Q stated that "[s]ales from

11  production and sale of biodiesel segment for the three months ended June 30, 2010

12  was *[$]18.5 million*, compared to $11.8 million in the same period of 2009, an

13  increase of $6.7 million or 56.8%. Sales volume of biodiesel for the three months

14  ended June 30, 2010 and 2009 were *22,500 tons* and 17,400 tons, respectively,

15  with *a[n] increase[] of 5,100 tons* or 29.3%, compared to the same period of

16  2009."

17      74.   On November 5, 2010, the Company filed with the SEC its financial

18  results for the third quarter of 2010, for the period ended September 30, 2010, on

19  Form 10-Q ("3Q 10-Q").   With respect to biodiesel production and sales from the

20  100,000-ton Tongchuan biodiesel factory, the 3Q 10-Q stated that "[s]ales from

21  production and sale of biodiesel segment for the three months ended September 30,

22  2010 was *$20.3 million*, compared to $14.9 million in the same period of 2009, an

23  increase of $5.4 million or 35.8%. Sales volume of biodiesel for the three months

24  ended September 30, 2010 and 2009 were *24,000 tons* and 19,700 tons,

25  respectively, with *a[n] increase[] of 4,300 tons* or 21.8%, compared to the same

26  period of 2009."

27      75.   The false and misleading 1Q 10-Q, 2Q 10-Q and 3Q 10-Q were each

28  signed by Defendant Gao.   In addition, Defendants Gao and Pu signed the

1  accompanying SOX Certifications, attesting to the accuracy of China Integrated's

2  financial statements in the 1Q 10-Q, 2Q 10-Q and 3Q 10-Q.

3       76.    On March 16, 2011, the Company filed with the SEC its financial

4  results for 2010 on Form 10-K ("2010 10-K").   With respect to biodiesel

5  production and sales, the 2010 10-K stated that "[f]or the year ended December 31,

6  2010, sales from production and sales of biodiesel were $74.9 million compared to

7  $55.8 million for the year ended December 31, 2009, an increase of $19.1 million

8  or 34.3% primarily resulted from the increase of sales business with our existing

9  biodiesel customers. The sales volume of biodiesel increased by 9,800 tons or

10  12.5% from the year ended December 31, 2009."

11       77.    The false and misleading 2010 10-K was signed by Defendants Gao,

12  Pu, Li, and Goldman.  Defendants Gao and Pu also signed the accompanying SOX

13  certifications, attesting to the accuracy of China Integrated's financial statements in

14  the 2010 10-K.

15       78.    In connection with the issuance of the 2010 10-K, the Company held a

16  conference call with financial analysts, attended by Defendants Gao and Pu, along

17  with the Company's Vice President of Investor Relations, Susan Zhou, to disclose

18  earnings on March 10, 2011.   During the call, Defendant Pu stated that the

19  Company sold "23,700 tons" of biodiesel in the fourth quarter of 2010.

20       79.    According to Defendants, the Company purportedly produced and

21  sold 88,600 tons of biodiesel during 2010.  In addition, Defendants represented that

22  the 100,000-ton Tongchuan factory was operating at full capacity.  For example,

23  on March 12, 2010, during an earnings call with analysts in connection with the

24  release of the 2009 10-K, Alex Gong, Vice President of Capital Markets, along

25  with Defendants Gao and Pu, stated that the Company was "running three shifts at

26  our current plant, so it's running to 100% capacity … one of our strengths is the

27  capacity … so for the next couple of quarters in terms of biodiesel our revenues

28  probably will stay the same."

80.    On August 5, 2010, during an earnings conference call with analysts, Defendants Gao and Pu were asked "how much more production can you squeeze from your existing plant?"  Defendant Pu responded that, "[r]ight now, at a full capacity of 100,000 tons biodiesel production plant, and normally we can generate 80,000 tons of sellable biodiesel.  So if we average out the quarters, we produce and sell about 20,000 tons [per quarter]."

81.    Defendants continued to represent that 100,000-ton Tongchuan factory was running at full production through the end of the Class Period.  On March 10, 2011, during the earning conference call, attended by Defendants Gao and Pu, the Company's Vice President of Investor Relations, Susan Zhou, explained that after some "maintenance" at the 100,000-ton Tongchuan factory in January 2011, "the plant is already back to full production on February 9, [2011], right after the Chinese New Year."

82.    Not only did the Company represent that the Tongchuan factory was running at full production, Defendants also represented that the Company sought to increase biodiesel production capacity by adding additional factories.  In the 2009 10-K, the 1Q 10-Q, the 2Q 10-Q, and the 3Q 10-Q, the Company represented to investors that it sought to increase production capacity at the Tongchuan factory to 150,000-tons by completing construction of a 50,000-ton production factory adjacent to the existing 100,000-ton factory.  According to the 2010 10-K, the Company expected to complete testing of the new 50,000-ton factory in March 2011.

### The 100,000-ton Tongchuan Factory

83.    Defendants' statements above (¶¶71-78) regarding the Company's biodiesel production and sales profit from the Company's 100,000-ton Tongchuan biodiesel factory were materially false and misleading when made.  As reported in the Alfred Little Report, a four-month surveillance of the factory during the Class Period confirmed that, contrary to Defendants' representations, there was "no

meaningful production" at the Tongchuan factory and, therefore, the reported sales were materially false and significantly inflated.

84.    The Alfred Little Report was the result of a "four month nearly continuous on site observation and video surveillance" investigation of the 100,000-ton Tongchuan biodiesel factory conducted by the International Financial Research & Analysis Group ("IFRA"), which was "commissioned by one of its hedge fund clients" and given to Alfred Little by IFRA with its client's permission. According to IFRA's website (http://ifragroup.com), IFRA is an "independent provider of complex financial analysis, business research and investigative due diligence services" and "[f]or more than 25 years, IFRA's principals have provided companies and individuals with the analysis and intelligence required to reduce their exposures in funding new business opportunities and investments."   In particular, IFRA "often conduct[s] investigations in parts of the world where publicly available information is scarce or nonexistent, such as the People's Republic of China."

85.    According to the Alfred Little Report, IFRA investigators visited the Tongchuan factory in June and October 2010, and then conducted a four-month video surveillance commencing on November 26, 2010 through March 2011.

86.    The Alfred Little Report linked to 40 videos of the time-lapse video surveillance of the idle 100,000-ton Tongchuan biodiesel factory showing no meaningful activity (available at http://vimeo.com/channels/cbeh (last visited December 5, 2011)).

87.    After four months, investigators confirmed "no meaningful production activity" at the Tongchuan factory, contrary to Defendants' statements.  Indeed, during the four month surveillance, investigators witnessed only six tanker trucks entering and exiting the factory, with five of those trucks arriving on the same day a group of 20 investors toured the factory on March 10, 2011, as arranged by the Company's investment bankers, Rodman & Renshaw.

88.    The Alfred Little Report detailed the March 10, 2011 incident as follows:

On March 9th investigators filmed CBEH employees busily cleaning and preparing the factory for the next day's investor tour. Early on the morning of March 10th, four large biodiesel tanker trucks arrived and parked at the factory. It seemed CBEH management had indeed planned a "show" for investors that day. Prior to this date, the surveillance team had only witnessed one previous tanker truck enter the factory (on March 2nd). Rather than filling up with biodiesel as would be expected in a real business operation, the four tankers sat idle for 1 hour 20 minutes awaiting the arrival of the investors. At 9:45am the Rodman & Renshaw investors arrived precisely on schedule and were greeted by CFO Albert Pu and VP-IR Susan Zhou. The plant immediately came alive with four 30-ton tanker trucks pretending to fill up with biodiesel while loud humming sounds came from the production line. A fifth tanker truck arrived during the tour. As far as anyone in attendance could tell, the Tongchuan plant appeared to be busily operating at 100% of capacity, just as management had repeatedly publicly stated. After the one-hour tour, CFO Albert Pu handed out gift bags and the investors departed. Management then departed. The last tanker truck departed. Most of the employees departed. The factory quickly went back to the same idle emptiness of the prior four months.

89.    Notably, Lead Counsel's investigators conducted on-site visits in Tonchuan City and confirmed that the factory monitored in the Alfred Little Report and videos was indeed Xi'an Baorun Industrial's 100,000-ton Tongchuan factory. Further, Lead Counsel's investigators in China found no evidence to

-28-    CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 11-02559-MMM-PLA

1  contradict the findings in the Alfred Little Report concerning the Tongchuan

2  biodiesel factory.

3      90.    The Alfred Little Report also reported that the Company did not have

4  a National Development & Reform Commission ("NDRC") production license for

5  its 100,000-ton Tongchuan biodiesel production factory.   In China, all biodiesel

6  plants must obtain a license from the NDRC before they can operate.   In the

7  Company's 2009 10-K and 2010 10-K, the Company states that it has a biodiesel

8  "distribution" license but there is no mention of a production license.   IFRA

9  investigators contacted a Shaanxi Provincial NDRC official, "Mr.Guo," who

10  confirmed that NDRC never issued a production license to China Integrated's

11  100,000-ton Tongchuan biodiesel production line.

12      91.    Lead Counsel's investigators did not find anything to contradict the

13  Alfred Little and IFRA findings concerning the lack of a production license for the

14  100,000-ton Tongchuan factory.   Lead Counsel's investigators contacted the

15  Shaanxi Provincial NDRC office, the Xi'an Municipal NDRC office, the

16  Tongchuan Municipal NDRC office, and the Tongchuan Municipal NDRC's

17  Transport Energy office.   None of the local NDRC offices could affirm that the

18  100,000-ton Tongchuan factory had a production license.

19      92.    In the Company's 2009 10-K and 2010 10-K, the Company stated that

20  it uses non-edible seed oil, waste cooking oil and vegetable oil residue as its raw

21  material, or feedstock, for the production of biodiesel.   The 2009 10-K and 2010

22  10-K stated that the Company has "entered into agreements with four Xi'an City

23  EPA-designated waste cooking oil processing companies to secure needed waste

24  cooking oil at favorable prices."   However, the Alfred Little Report revealed that

25  IFRA investigators contacted the four collection centers, and discovered that these

26  collection centers produced an insufficient amount, "less than 15 tons of waste

27  cooking oil per day," to supply the Company's biodiesel production that the

28

1    Company claimed.  In addition, "three of the centers deny they have sold *any*

2    waste cooking oil to Baorun Tongchuan in the last two years."

3        93.    In addition, the Company's 2009 10-K stated that the Company also

4    signed contracts with five local associations to supply Chinese prickly ash, an oil-

5    producing plant, to use as raw material, or feedstock, for biodiesel production.  The

6    2009 10-K states that the Company "signed raw material purchasing contracts with

7    local associations such as Tongchuan City Chinese Prickly Ash Association, the

8    Forestry Bureau of Yongshou County, the Forest and Fruits Production Managing

9    Station of Danfeng County, the Forestry Bureau of Ningqiang County and the

10   Forestry Bureau of Liuba County."

11       94.    Lead Counsel's investigators contacted the Danfeng, Ningqiang and

12   Liuba forest bureau associations and confirmed that, contrary to Defendants'

13   statements, these associations did *not* have any purchase arrangement with the

14   Company.  The Alfred Little Report investigation also reported that these three

15   associations "denied the existence of having any relationship" with the Company.

16   In addition, the Alfred Little Report reported that "none of these three counties

17   (Danfeng, Ningqiang, Liuba) said they actually plant any significant amount of

18   Chinese Prickly Ash."  Additionally, both the Alfred Little investigators and Lead

19   Counsel's investigators were unable to locate or confirm the existence of the

20   "Tongchuan City Chinese Prickly Ash Association" as identified in the Company's

21   2009 10-K.

22       95.    These false statements concerning the Company's supply of raw

23   materials for its biodiesel production corroborate the false and misleading

24   statements concerning the sales of biodiesel and production activity at the 100,000-

25   ton Tongchuan factory.

26

27

28

**The 50,000-ton Chongqing Tianrun Biodiesel Factory**

96.     In October 2010, China Integrated purportedly acquired a 100%
equity interest in Chongqing Tianrun Energy Development Co., Ltd., a biodiesel
production plant with 50,000 tons of biodiesel production capacity ("Chongqing
Tianrun").   According to the Company's 2010 10-K, "[t]he reason the Group
acquired Chongqing Tianrun is to expand its production capacity and to leverage
its distribution network.  The operating results of Chongqing Tianrun have been
included in the consolidated financial statements since the Acquisition date on
October 28, 2010."

97.     During an earnings call on March 10, 2011, that was attended by
Defendants Gao and Pu, the Company's Vice President of Investors Relations,
Susan Zhou, stated that the 50,000-ton Chongqing factory was "currently running
at full capacity" and that after acquiring the factory in October 2010, "[i]n
November and December, we did some adjustments in the process and right now it
is already running at full capacity."  In addition, in the Company's Rebuttal to the
Sinclair Upton Report, the Company stated that "[w]e have already ramped up
production of this facility to 100% utilization since January 2011."

98.     Defendants' statements concerning the production of biodiesel at the
Chongqing Tianrun 50,000-ton factory, however, were false and misleading when
made.   The Alfred Little investigation reported that *during three months of
continuous surveillance, the investigators witnessed no tanker trucks*" entering or
existing the Chongqing Tianrun factory.  In addition, the Alfred Little Report
included a link to 24 time-lapse videos showing no meaningful activity at
Chongqing Tianrun from February 14, 2011 through March 11, 2011 (available at
http://vimeo.com/channels/cbeh (last visited December 5, 2011)).

99.     The Alfred Little Report reported the lack of any meaningful activity
at the Chongqing Tianrun factory, stating:

-31-     CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 11-02559-MMM-PLA

The only evidence of any possible production during the ongoing surveillance has been the presence of the occasional truck carrying barrels that could contain oil feedstock. The total amount is certainly less than 150 tons over the entire three months. Evening factoring out the Chinese New Year holiday, given management's claim that the plant is running at 100% capacity would indicate production and sales of over 11,000 tons during the three months of surveillance. *The surveillance evidence therefore irrefutably shows there has been no meaningful production.*

100.   Lead Counsel's investigators conducted on-site visits outside of the Chongqing Tianrun factory and confirmed that the factory monitored in the Alfred Little Report and videos was indeed the Chongqing Tianrun 50,000-ton factory. Further, Lead Counsel's investigators in China found no evidence to contradict that the Alfred Little Report concerning the Chongqing Tianrun biodiesel factory.  In addition, on November 28, 2011, a security guard outside of the factory walls claimed that the factory had stopped all production in August 2011 for "large-scaled reform/remediation."

**C.     Materially False Statements And Omissions Concerning Related Party Transactions**

101.   On November 2, 2010, China Integrated filed with the SEC a press release on Form 8-K signed by Defendant Gao (the "November Form 8-K") announcing the purchase of: (1) the Chongqing Tianrun Energy Development Co., Ltd., a biodiesel production plant with 50,000 tons of biodiesel production capacity ("Chongqing Tianrun") for $16.5 million (RMB 110,000,000); and (2) the Shenmu gas station, a privately owned service gas station, located in Shenmu County, Yulin City, Shaanxi Province, PRC (the "Shenmu gas station") for $9.2 million (RMB 61,000,000).

102.   On November 5, 2010, China Integrated filed with the SEC its 3Q 10-Q, signed and certified as to its accuracy by Defendants Gao and Pu, disclosing the purchases of the Chongqing factory and Shenmu gas station, stating:

> On October 18, 2010, the Company entered and executed a definitive purchase agreement to acquire Chongqing Tianrun Energy Development Co., Ltd, a biodiesel production plant with 50,000 tons of biodiesel production capacity, for a total cash consideration of approximately $16.5 million (RMB 110,000,000). The acquisition furthers the Company's growth strategy and expansion in production and sale of biodiesel business segment.
>
> [. . .]
>
> On October 19, 2010, the Company completed an acquisition of 100% of Shenmu gas station, a privately owned service gas station, located in Shenmu County, Yulin City, Shaanxi Province, PRC. The acquisition furthers the Company's growth strategy and expansion in operation of its retail gas station business segment. The total purchase price of Shenmu gas station was approximately $9,180,235 (RMB 61,000,000) in cash with no assumption of liabilities.

103.   Then, on March 16, 2011, the Company filed with the SEC its 2010 10-K, which also disclosed the purchases of the Chongqing factory and Shenmu gas station, but under the heading "Related Party Transactions," the 2010 10-K listed "None."

104.   As detailed below, the November Form 8-K, the 3Q 10-Q and the 2010 10-K were false and misleading because these SEC filings concealed the related party transactions between China Integrated's CEO, Defendant Gao, and his son, Gao Bo, in the acquisition of the Chongqing factory and Shenmu gas station.

**The Accounting Standards Require
Disclosure Of Related-Party Transactions**

105.   Generally Accepted Accounting Principles ("GAAP"), Financial
Accounting Standards Board ("FSAB") and SEC regulations mandate that all
material financial transactions between an issuer and its officers and directors be
prominently disclosed in the financial statements.   Defendants knowingly failed to
disclose the related party payments.   As a result, China Integrated's financial
statements did not comply with GAAP and were materially misleading.

106.   FASB Accounting Standards Codification ("ASC") No. 850 (formerly
Financial Accounting Standards No. 57) provides that a public company's
"[f]inancial statements shall include disclosures of material related party
transactions."   FASB ASC 850-10-50-1; SFAS No. 57 ¶2.

107.   "Related party transactions" include those between "[a]n entity and its
principal owners, management, or members of their *immediate families*" and those
between a company and its "affiliates."   FASB ASC 850-10-05-3; SFAS No. 57
¶1.   "Affiliate" includes any company that is under common control or
management with the public company.   FASB ASC 850-10-20; SFAS No. 57
¶24(a).

108.   Disclosures of related party transactions shall include (a) the nature of
the relationship(s) involved, (b) a description of the transactions, including
transactions to which no amounts or nominal amounts were ascribed, for each of
the periods for which income statements are presented, and such other information
deemed necessary to an understanding of the effects of the transactions on the
financial statements, (c) the dollar amounts of transactions for each of the periods
for which income statements are presented and the effects of any change in the
method of establishing the terms from that used in the preceding period, and (d)
amounts due from or to related parties as of the date of each balance sheet

1  presented and, if not otherwise apparent, the terms and manner of settlement.

2  FASB ASC 850-10-50-1; SFAS No. 57 ¶2.

3  **The Chongqing Tianrun Related-Party Transaction**

4      109. According to SAIC filings obtained by Lead Counsel, Defendant

5  Gao's son, Gao Bo, owned 52.5% of Chongqing Tianrun at the time of the

6  acquisition by China Integrated.  The 2010 10-K stated that China Integrated

7  "acquired 100% equity interest in Chongqing Tianrun" on October 28, 2010.

8  Notably, the SAIC filings obtained by Lead Counsel's investigators corroborate the

9  findings concerning related parties revealed in the Sinclair Upton Report.   In

10  addition, analysts at Roth Capital Partners noted in an analyst report on March 17,

11  2011, that they independently obtained the SAIC filings referenced in the Sinclair

12  Upton Report, and reported that the "[S]AIC data presented in the third-party

13  report is consistent with the information we obtained independently."  Moreover,

14  Roth Capital Partners explained that "we believe the registration and ownership

15  data should be accurate, since that is the primary purpose of these [SAIC] filings."

16  As explained above, filing false SAIC filings result in fines and even criminal

17  penalties under Chinese law, and can result in the revocation of the company's

18  business license, which may render the business unable to maintain a bank account

19  or legally conduct business in China.

20      110. According to the SAIC filings for Chongqing Tianrun, and not

21  disclosed in the Company's SEC filings, on April 3, 2009, Gao Bo pledged to

22  contribute RMB 10,500,000 by July 6, 2009, to the registered capital of Chongqing

23  Huazheng Energy Development Co., Ltd. ("Huazheng"), the name of the company

24  prior to being renamed Chongqing Tianrun, and was elected as one of the members

25  of Huazheng's Board of Directors.   Then, on July 3, 2009, Gao Bo's RMB

26  10,500,000 was deposited into Huazheng's bank account, representing 52.5% of

27  Huazheng's registered capital.  On March 11, 2010, Gao Bo participated as one of

28

1   the 17 total shareholders and signed the shareholders' meeting resolution to change

2   Huazheng's name to Chongqing Tianrun.

3        111.  The SAIC filings state that Gao Bo was still a majority shareholder of

4   Chongqing Tianrun at time of the October 2010 acquisition by Xi'an Baorun

5   Industrial, and remained a shareholder *through March 12, 2011*. According to an

6   equity transfer agreement dated March 12, 2011, attached to Chongqing Tianrun's

7   application for a change to registration dated March 15, 2011, *Gao Bo transferred*

8   *his 52.5% equity interests in Chongqing Tianrun in exchange for RMB*

9   *9,698,300.00* to Chongqing Huaneng Recycling for Old and Waste Materials Co.,

10   Ltd. ("Huaneng"), along with two other shareholders of Chongqing Tianrun. A

11   copy of Gao Bo's identification card was attached to the application in a document

12   with a heading of "Information of Directors, Supervisors, and Managers." The 14

13   other remaining shareholders transferred their shares directly to Xi'an Baorun

14   Industrial.

15        112.  According to the "Shareholders' Meeting Resolution (Second Round

16   First Time)" of Chongqing Tianrun, dated March 12, 2011, participated by

17   Huaneng and Xi'an Baorun Industrial, the shareholders "*agree for* Jiankang Gao,

18   Jianhua Fang, *Gao Bo*, Xiaoyong Wang and Shenglu Zhao *to resign from their*

19   *positions of Directors*" *and* "*agree to elect* Jiankang Gao, *Gao Bo* and Gaihong Li

20   *as the Company's Directors*." Finally, on March 30, 2011, Huaneng transferred

21   its equity (59.4%) to Xi'an Baorun Industrial. According to the SAIC filings,

22   Xi'an Baorun Industrial did not have 100% ownership of Chongqing Tianrun until

23   March 30, 2011, contrary to Defendants' representation in the 2010 10-K that

24   China Integrated "acquired 100% equity interest in Chongqing Tianrun" on

25   October 28, 2010.

26        113.  In the Company's Rebuttal to the Sinclair Upton Report, dated March

27   23, 2011, the Company denied that Gao Bo was an owner at the time of the

28   acquisition by China Integrated and claimed that:

In connection with the Tianrun transaction, after Mr. Gao made a significant deposit from his own personal funds [in 2009], Mr. Gao was allowed to, and did, designate a shareholder of Tianrun to safeguard the deposit and monitor the construction that was underway at Tianrun. Mr. Gao designated his son, Gao Bo, to act in this capacity. Gao Jiankang acted as the legal representative of Tianrun, but he is not related to Mr. Gao. *Upon completion of certain construction to increase the capacity of the plant, in November 2009, Gao Bo exited ownership of Tianrun and the security deposit was returned to Mr. Gao.*

114.   According to the SAIC filings described above, however, Gao Bo was still a majority shareholder of Chongqing Tianrun at time of the October 2010 acquisition by China Integrated, and remained a shareholder through at least March 12, 2011. As a 52.5% owner of Chongqing Tianrun, Gao Bo received $8.6 million of the $16.5 million paid by China Integrated for the biodiesel factory, but the Company never disclosed this purchase as a related-party transaction in violation of GAAP.

115.   In addition, in the Rebuttal, the Company defended the Chongqing Tianrun acquisition claiming that Company did not overpay for the biodiesel factory. The Rebuttal stated that "Tianrun generated approximately $11.3 million and approximately $25.0 million in revenue for the years ended December 31, 2009 and December 31, 2010, respectively; and approximately $2.0 million and approximately $4.2 million of pre-tax income, respectively."

116.   However, according to Chongqing Tianrun's 2009 Income Statement filed with the Chongqing AIC obtained by Lead Counsel, Chongqing Tianrun's operating revenue and pre-tax income for the year ended December 31, 2009 were only RMB 10,052,553.81 (USD $1,473,804.91) and RMB -2,815,063.25 (USD -$412,716.42), respectively. Thus, the Company overstated the Chongqing

1  Tianrun's 2009 revenues by $9.8 million, or 666.7%.   The falsity of the

2  Company's statements concerning Chongqing Tianrun's revenues further supports

3  that China Integrated, at the direction of Defendant Gao, sought to benefit his son,

4  Gao Bo, by overpaying for Chongqing Tianrun in the undisclosed related-party

5  transaction.

6  **The Shenmu Gas Station Related-Party Transaction**

7  117.   According to SAIC filings for the Shenmu County Erlintu Hongtu Oil

8  Material Co., Ltd ("Shenmu County"), obtained by analysts at Sinclair Upton and

9  corroborated by the Roth Capital Partners analyst report dated March 17, 2011,

10  Gao Bo owned 80% equity interest prior to China Integrated's acquisition of the

11  Shenmu gas station.   As an 80% owner of the Shenmu gas station, Gao Bo

12  purportedly received $7.36 million out of the $9.2 million paid by China Integrated

13  for the gas station.

14  118.   Notably, Lead Counsel also obtained SAIC information that states that

15  Gao Bo was an owner of the Shenmu gas station prior to the transaction, however,

16  this was never disclosed by the Company until the Rebuttal on March 23, 2011.

17  119.   In the Rebuttal to the Sinclair Upton Report, the Company stated that:

18  With regard to the acquisition of the Shenmu gas station, in

19  September 2010, we prepaid RMB 20 million as a security deposit to

20  Lu Wehhua, the legal representative and a majority shareholder of

21  Shenmu, to expedite transferring the ownership, related gas station

22  operating permits and land use right. Based on that payment, *Gao Bo*

23  *received 80% of the ownership of Shenmu* from Lu Wenhua and

24  Wang Zhijun . . . . We intend to transfer the ownership interest in

25  Shenmu held by Gao Bo, on behalf of Baorun Industrial, and

26  Yongsheng Song, to Xi'an Baorun Industrial.

27  120.   The Company's Rebuttal admits that China Integrated had paid RMB

28  20 million for an interest in Shenmu that it then transferred to Defendant Gao's

son, but never disclosed this acquisition as a related party transaction.   In its Rebuttal, the Company attempted to reassure investors, indicating that it "intended" to have this interest transferred back to China Integrated.   However, according to information retrieved from the "Enterprise Information Search" function of the Shaanxi Administration for Industry & Commerce's online database, available at http://www.snaic.gov.cn/ (last visited on December 1, 2011), Gao Bo, the son of the Company's CEO, is still listed as the legal representative of the Shenmu County.

121.   In addition, in the Rebuttal, the Company defended the Shenmu gas station acquisition claiming that Company did not overpay for the gas station.   The Rebuttal claimed that "[d]uring the past twelve months, the acquired gas station sold approximately 8,000 tons of fuel and generated revenue of approximately $8.2 million."   According to Shenmu County SAIC's computerized Income Statements, however, Shenmu only reported operating revenues for 2008, 2009 and 2010 of RMB 11,240,000 (USD $1,647,896.40), RMB 15,160,000 (USD $2,222,607.60), and RMB 19,800,000 (USD $2,902,878.00), respectively.   The falsity of the Company's statements concerning Shenmu's revenues further supports that China Integrated, at the direction of Defendant Gao, sought to benefit his son, Gao Bo, by overpaying for Shenmu gas station in the undisclosed related-party transaction.

**D.     The False And Misleading Statements Artificially Inflated The Price Of China Integrated's Stock Allowing The Company To Raise Over $39.4 Million In The Secondary Offerings**

122.   Defendants' fraudulent scheme, as set forth above, which (i) inflated the Company's true earnings and caused the Company to falsely report its revenues and net income in its SEC filings, (ii) caused the Company to falsely report growing production and sales from its biodiesel segment where in truth its biodiesel factory had no meaningful activity or production, and (iii) concealed purchases of business that directly benefitted Defendant Gao's son, allowed the

1   Company to raise over $39.4 million through the sale of common stock, each at the

2   inflated price of $7.00 per share, in the Secondary Offerings.

3       123.   In connection with the Secondary Offerings, on May 10, 2010, the

4   Company filed with the SEC a Registration Statement, pursuant to Form 3, which

5   was deemed effective by the SEC on May 19, 2010.  The Registration Statement

6   incorporated by reference the false and misleading 2009 10-K described above.

7       124.   On December 28, 2010, the Company entered into a securities

8   purchase agreement with certain investors for the private placement of 2,185,716

9   shares of the Company's common stock at $7.00 per share, together with warrants,

10  exercisable for a six month period following the closing date, to purchase up to

11  1,092,858 shares of common stock.

12      125.   This offering was sold pursuant to the Registration Statement and the

13  Prospectus Supplement filed with the SEC on December 30, 2010 (the "December

14  Prospectus").  The offering took place on or about December 31, 2010, generating

15  total gross proceeds from the offering of $15,300,012.

16      126.   On January 3, 2011, the Company entered into another securities

17  purchase agreement with certain institutional investors for a registered direct

18  offering of 3,453,572 shares of the Company's common stock also at a price of

19  $7.00 per share, along with 2,185,716 warrants to purchase a total of 1,726,786

20  shares of common stock.

21      127.   This offering was sold pursuant to the Registration Statement and the

22  Prospectus Supplement filed with the SEC on January 5, 2010 (the "January

23  Prospectus").  The offering took place on or about January 7, 2011, generating

24  total gross proceeds of $24.17 million.

25      128.   The December and January Prospectuses (the "Prospectuses")

26  incorporated by reference the false and misleading 2009 10-K, 1Q 10-Q, 2Q 10-Q,

27  and 3Q 10-Q described above.  In addition, the Prospectuses disclosed the

28  acquisition of the Shenmu gas station and the Chongqing Tianrun biodiesel factory

in October 2010, but did not disclose the related-party transactions as described above.

129. Through these Secondary Offerings, in which China Integrated was able to sell over 5.6 million shares at the inflated stock price of $7.00 per share, *the Company reaped over $39.4 million*.

## VII.   THE TRUTH EMERGES

130. On March 16, 2011, the analyst firm Sinclair Upton Research issued a detailed, 44-page report (defined above as the "Sinclair Upton Report") on China Integrated revealing, among other things, that:

(i)   the primary Chinese operating subsidiary of China Integrated, Xi'an Baorun Industrial, had significantly lower revenues, fixed assets and net income for 2008 and 2009 in its SAIC financial statements, as compared to the overstated amount claimed in the Company's 2009 Form 10-K filed with the SEC;

(ii)   the Company and Defendant Gao had been funneling money to corporations owned by Defendants Gao's son, Gao Bo, through the acquisitions of the Chongqing Tianrun biodiesel factory and the Shenmu gas station;

(iii)   the Chongqing Tianrun biodiesel factory is not as profitable or large as China Integrated claimed and the Shenmu gas station was "just an empty shell company" without any operations, and, thus the Company overpaid for the acquisitions; and

(iv)   the Company's biodiesel segment's revenues and earnings were greatly overstated in the Company's SEC filings.

131. In reaction to the Sinclair Upton Report, the Company's stock price fell from an opening price of $5.95 to a closing price of $5.00 per share, dropping nearly 16% ($0.95 per share), on heavy trading volume.

132.   The following day, on March 17, 2011, analysts at Roth Capital Partners downgraded China Integrated stock, stating:

> We are *downgrading shares* of CBEH to NEUTRAL (from BUY) pending clarification from management *on allegations raised by a recent third-party research report* and our completion of further due diligence.
>
> M&A activities require clarification.  The allegations suggest, among other things, that CBEH's recent M&A potentially involved related party transactions and overpayment.   We recently independently obtained the AIC filings for CBEH's operating subsidiaries, and were in the process of analyzing the data and seeking clarification from management.  *The [S]AIC data presented in the third-party report is consistent with the information we obtained independently.*  We note that while AIC filings may not be completely reliable sources of income statement data (particularly net income), we believe the registration and ownership data should be accurate, since that is the primary purpose of these filings.

133.   The Company's stock price continued to fall on March 17, 2011, dropping 24.6% ($1.23 per share), from a closing price of $5.00 per share the previous day to a closing price of $3.52 per share, on heavy trading volume.

134.   On March 23, 2011, the Company issued it Rebuttal purporting to respond to the allegations in the Sinclair Upton Report.  Among other things, the Company vigorously denied it had made any misstatements in its financial statements and SEC filings, and denied all of the other accusations in the Sinclair Upton Report.  The Company referenced boilerplate rhetoric of the purportedly "well-known fact that there is rare consistency between Chinese SAIC filings and U.S. SEC filings" and "differences in accounting treatment between Chinese accounting standards and U.S. GAAP," but did not explain how these differences

1  would account for the significant discrepancies *of over $37 million* between the

2  net income reported in the SAIC filings and the Company's SEC filings.

3      135.  In its Rebuttal, the Company admitted that Gao Bo was Defendant

4  Gao's son, but stated that China Integrated "never transferred or otherwise

5  misappropriated any shareholder funds to the CEO's son, or any other party."

6      136.  With respect to the Shenmu transaction, the Company stated:

7      [I]n September 2010, we prepaid RMB 20 million as a security

8      deposit to Lu Wehhua, the legal representative and a majority

9      shareholder of Shenmu, to expedite transferring the ownership, related

10     gas station operating permits and land use right. Based on that

11     payment, *Gao Bo received 80% of the ownership of Shenmu* from Lu

12     Wenhua and Wang Zhijun . . . . We intend to transfer the ownership

13     interest in Shenmu held by Gao Bo, on behalf of Xi'an Baorun

14     Industrial, and Yongsheng Song, to Xi'an Baorun Industrial.

15     137.  Thus, the Company acknowledged that it had paid RMB 20 million

16  for an interest in Shenmu that it then transferred to Defendant Gao's son.  In its

17  Rebuttal, the Company attempted to reassure investors, indicating that it

18  "intended" to have this interest transferred back to China Integrated.

19     138.  With respect to the Chongqing Tianrun acquisition, the Company

20  denied the related party transaction.  In its Rebuttal, the Company admitted that

21  Gao Bo had "ownership" interest in the Chongqing Tianrun factory in 2009, but

22  Gao Bo purportedly "exited ownership" in November 2009.

23     139.  The Rebuttal issued on March 23, 2011, also continued to mislead

24  investors by stating that the Chongqing Tianrun biodiesel plant had "already

25  ramped up production of this facility to 100% utilization since January 2011."

26     140.  On the day of the Company's Rebuttal on March 23, 2011, the

27  Company's shares fell another 9.67% ($0.41 per share), from a closing price of

28  $4.24 per share the previous day to a closing price of $3.83 per share.

141.   On March 28, 2011, analyst firm Alfred Little issued a detailed report on China Integrated calling the Company *a "complete hoax"* based on, among other things, its review and analysis of the Company's SAIC filings and 2009 Chinese "audited" financial statements by its Chinese auditor, Zhongrui Yuehua Certified Public Accountants, and *on-site and video surveillance* of the 100,000-ton Tongchuan biodiesel factory and the Chongqing Tianrun biodiesel factory. The Alfred Little Report stated, in part:

1. *Four months [of] nearly continuous on site observation and video surveillance of CBEH's biodiesel operations in Xi'an (Tongchuan) confirm no meaningful production activity*, completely demolishing management's repeated claims the plant is running at 100% of capacity and generated $22,876,791 gross profit in 2010. On March 10, 2011, investigators caught and filmed CBEH management "redhanded" *staging phony production activity at the factory* with the criminal intent to defraud a group of 20 investors touring at the expense of CBEH's investment bank, Rodman & Renshaw (NASDAQ: RODM).

2. *Three months of on-site and video surveillance of CBEH's recently acquired Chongqing Tianrun biodiesel plant confirm no meaningful production activity*, either; completely contrary to management's claims the plant is running at 100% of capacity since January [2011].

3. The largest PRC auditor performed an independent audit of CBEH's 2009 financial statements showing no revenue from biodiesel sales while *gross profit from its wholesale and retail diesel division was 46% lower than reported in its 2009 10-K filing*.

142.   That same day, in a press release dated March 28, 2011, the Company announced that China Integrated's Audit Committee determined that it would

conduct an investigation into the allegations in the Alfred Little Report and Sinclair Upton Report, but it continued to deny any wrongdoing.

143. These announcements caused the Company's stock to **drop over 29%** ($1.10 per share), from a closing price of $3.76 on March 25, 2011, to a closing price of $2.66 per share on March 28, 2011, on heavy trading volume.

144. On April 5, 2011, the Company announced that the Audit Committee of the Company's Board of Directors retained Pillsbury Winthrop and Deloitte to advise the Company's Audit Committee in connection with the internal investigation.

145. After the market closed on April 20, 2011, the NASDAQ announced that trading in China Integrated stock was halted at the last trading price of $1.84 per share. The NASDAQ stated in its announcement that "[t]rading will remain halted until China Integrated Energy, Inc. has fully satisfied NASDAQ's request for additional information."

146. Since the close of trading on April 20, 2011, the Company's stock did not trade on the NASDAQ and was ultimately delisted and removed from the NASDAQ exchange, leaving the stock to trade over-the-counter on the "pink sheets."

## VIII. ADDITIONAL FACTS DEMONSTRATING FALSITY AND SCIENTER

### A. NASDAQ Delisted The Company's Securities From Trading Due To The Seriousness Of China Integrated's Misconduct

147. Following the revelations in the Sinclair Upton Report and Alfred Little Report, and the Company's announcement of its Internal Investigation, the NASDAQ halted the trading of China Integrated Stock after the close of trading on April 20, 2011, "until China Integrated Energy, Inc. has fully satisfied NASDAQ's request for additional information" concerning the allegations – which it could not do.

148.   On May 16, 2011, China Integrated received a letter from NASDAQ indicating that the continued listing of the Company's securities on the NASDAQ stock market was "*no longer warranted*" based on:

(1) *public interest concerns* pursuant to Nasdaq Listing Rule 5101, raised by (i) *the Company's obstruction of the board's independent investigation into the recent allegations made by various individuals* (the "Investigation"), (ii) the resulting inability of the audit committee to conduct an independent investigation of the serious allegations related to the Company's business, and (iii) *KPMG advising that its previously issued audit report should no longer be relied upon*;

(2) the failure by the Company to comply with the majority independent board and audit committee requirements set forth in Listing Rules 5605(b)(1) and 5605(c)(2); and

(3) *management's obstruction of the Investigation* prevented the Audit Committee from fulfilling its authority regarding: (i) complaints relating to accounting, internal accounting controls or auditing matters; and (ii) its authority to engage and fund advisors as set forth in Listing Rule 5605(c)(3) and IM-5605-5

149.   After a hearing and review of the information provided by the Company, the NASDAQ Hearing Panel issued a decision dated June 24, 2011, which denied the Company continued listing.

150.   On November 10, 2011, the NASDAQ announced that it had determined to "remove from listing the common stock of China Integrated ... effective at the opening of the trading session on November 21, 2011. *Based on review of information provided by the Company, NASDAQ Staff determined that the Company no longer qualified for listing* on the Exchange."

**B.** **Management's Refusal To Cooperate With The
Investigation And Resignations In Connection With The
Investigation Raise Strong Inference Of Scienter And Falsity**

151.   On April 5, 2011, the Company announced that the Audit Committee
had retained the law firm Pillsbury Winthrop and accounting firm Deloitte, along
with the Chinese law firm, King & Wood, to conduct the Company's internal
investigation into the issues raised in the Sinclair Upton and Alfred Little Reports.

152.   On April 21, 2011, Director Goldman, who served as Chairman of the
Audit Committee and was designated the Company's "audit committee financial
expert" pursuant to the SEC's rules and regulations, submitted his resignation to
the Board of Directors.   In his resignation letter, Director Goldman stated:

> As you know, numerous allegations of a serious nature have been
> published recently, some of which question the conduct of CBEH's
> management and certain business operations of the Company. On
> March 28, 2011, the Company issued a press release that, among other
> things, denied all of these allegations and stated that the Audit
> Committee of the Board had authorized and would launch an
> independent investigation into these allegations. The Audit Committee
> subsequently engaged Pillsbury Winthrop Shaw Pittman LLP,
> Deloitte Financial Advisory Services LLP and King and Wood to
> conduct this investigation.
>
> My understanding is that the fieldwork for this independent
> investigation started April 11, 2011 and a team of investigators from
> Pillsbury Winthrop, Deloitte and King and Wood were present at the
> Company's offices to begin work on this investigation. Information
> requests were sent to the Company in advance. Thereafter, Pillsbury
> Winthrop advised the Audit Committee in writing and orally (a copy
> of their letter is attached) that *management had refused to cooperate
> and supply the information requested by Pillsbury Winthrop* and

1    therefore they could no longer continue the investigation in a manner

2    that would meet their professional standards of conducting an

3    independent investigation. *As a result, Pillsbury Winthrop has*

4    *resigned from its engagement.*

5    These events lead me to the conclusion that I cannot continue to serve

6    as a director of CBEH. Accordingly, I resign my position as director

7    and as Chairman of the Audit Committee, effective immediately.

8    153. On April 21, 2011, the Audit Committee of the Company also

9    received a notification from Pillsbury Winthrop that effective immediately, it

10   resigned as special counsel to the Audit Committee. In addition, Pillsbury notified

11   the Audit Committee that Deloitte and King & Wood had also resigned from their

12   engagement.

13   154. On April 28, 2011, Defendant Pu resigned from his position as the

14   Chief Financial Officer of the Company.

15   155. On May 3, 2011, Director Wang, another member of the Audit

16   Committee, submitted his resignation to the Board, stating: "*Recent events,*

17   *including but not limited to the inconsistencies between representations made by*

18   *CBEH's management to the Board of Directors, have eroded my confidence and*

19   *led me to conclude that I cannot continue to serve as director of CBEH.*"

20   **C.    KPMG's Resignation And Withdrawal Of Its Audit Opinion**

21   156. After replacing Sherb on December 16, 2010, KPMG, one of the "Big

22   Four" auditing firms, served as the Company's outside auditor until April 26, 2011.

23   After serving as the Company's auditor for only just over four months, and in the

24   wake of the Sinclair Upton and Alfred Little revelations, KPMG resigned as the

25   Company's auditor. In its letter of resignation, KPMG stated it was resigning

26   because:

27   The inconsistency between management's representation to us that it

28   will fully cooperate with the special investigation requested and

---

-48-    CONSOLIDATED CLASS ACTION COMPLAINT
Case No. CV 11-02559-MMM-PLA

authorized by the Audit Committee and the manner of management's
conduct during the investigation raises doubts about management's
representations provided to us in connection with our 2010 audits of
the consolidated financial statements and the effectiveness of internal
control over financial reporting of the Company.

157.   Moreover, KPMG notified the Company that its audit report and
internal controls opinion filed with the Company's 2010 Form 10-K on March 16,
2011, *should no longer be relied upon*, stating:

We hereby notify the Company that disclosures should be made or
action should be taken to prevent future reliance on our previously
issued audit reports dated March 16, 2011 related to the consolidated
balance sheet of China Integrated Energy, Inc. and subsidiaries as of
December 31, 2010, and the related consolidated statements of
income and comprehensive income, stockholder's equity, and cash
flows for the year then ended and the effectiveness of internal control
over financial reporting as of December 31, 2010.

158.   As a result, KPMG's audit opinion has been withdrawn and the
Company's 2010 financial statements remain unaudited.

**D.    The SEC Has Warned Of Reverse Merger
        Companies Such As China Integrated**

159.   Foreign-based companies, such as China Integrated, which attained
listing on U.S. securities exchanges through "reverse mergers" with existing public
shell companies, have come under increased scrutiny by the SEC.   Although a
reverse merger allows a Chinese company to trade on a U.S. stock exchange, like
China Integrated, these companies' assets and operations are often solely located in
China.   This limits the SEC's ability to regulate and enforce the U.S. Securities
laws against Chinese companies, especially given that these corporations did not
complete the more rigorous requirements of an initial public offering.   *See* SEC

Investor Bulletin: Reverse Mergers, issued June 9, 2011 (available at
http://www.sec.gov/news/ press/2011/2011-123.htm).

160.   The pervasive misconduct at these companies has led the SEC to
establish a task force to investigate investors' claims regarding alleged impropriety
and fraud of reverse merger companies trading on the U.S. markets. On April 4,
2011, SEC Commissioner Luis A. Aguilar discussed Chinese reverse mergers and
the process of "backdoor registrations," stating:

> In the world of backdoor registrations to gain entry into the U.S.
> public market, *the use by Chinese companies has raised some
> unique issues*, even compared to mergers by U.S. companies. Two
> important ones are:
>
> First, *there appear to be systematic concerns with the quality of the
> auditing and financial reporting*; and
>
> Second, *even though these companies are registered here in the
> U.S., there are limitations on the ability to enforce the securities
> laws, and for investors to recover their losses when disclosures are
> found to be untrue, or even fraudulent.*
>
> I am worried by *the systematic concerns surrounding the quality of
> the financial reporting by these companies*. In particular, according
> to a recent report by the staff of the Public Company Accounting
> Oversight Board (PCAOB), U.S. auditing firms may be issuing audit
> opinions on the financials, but not engaging in any of their own work.
> Instead, the U.S. firm may be issuing an opinion based almost entirely
> on work performed by Chinese audit firms. If this is true, it could
> appear that the U.S. audit firms are simply selling their name and
> PCAOB-registered status because they are not engaging in
> independent activity to confirm that the work they are relying on is of

1    high quality. This is significant for a lot of reasons, including that the

2    PCAOB has been prevented from inspecting audit firms in China.[4]

3       161.   On June 9, 2011, the SEC issued an Investor Bulletin warning

4    investors about investing in companies that enter U.S. stock markets through

5    reverse mergers, stating that "there have been instances of fraud and other abuses

6    involving reverse merger companies." *See* SEC Investor Bulletin: Reverse

7    Mergers, issued June 9, 2011 (available at http://www.sec.gov/news

8    /press/2011/2011-123.htm). The SEC noted that the "SEC and U.S. exchanges

9    recently suspended trading in a more than a dozen reverse merger companies,

10   citing a lack of current, accurate information about these firms and their finances."

11   *Id.* The Director of the SEC's Office of Investor Education and Advocacy also

12   stated that "[g]iven the potential risks, investors should be especially careful when

13   considering investing in the stock of reverse merger companies." *Id.*

14       162.   Additionally, as referenced by SEC Commissioner Aguilar, the Public

15   Company Accounting Oversight Board ("PCAOB"), which was established by

16   Congress to oversee the audits of public companies, has recently investigated the

17   audit implications for reverse mergers involving China-based companies.

18       163.   Notably, following the resignation of KPMG, a "Big Four"

19   accounting firm, the Company sought to retain a new auditor, claiming that it

20   preferred "to retain one of the upper echelon auditing firms" and pursued engaging

21   the accounting firm BDO Seidman. However, in China Integrated's letter to the

22   SEC, dated May 16, 2011, the Company admitted:

23       [W]e were advised by BDO that as a result of the PCAOB Research

24       Note # 2011-P1 entitled, 'Activity Summary and Audit Implications

25       for Reverse Mergers involving Companies for the China Region:

26

27   ─────────────────────

28   [4] "Speech by SEC Commissioner: Facilitating Real Capital Formation," Council of
     Institutional Investors Spring Meeting, Washington, D.C., April 4, 2011 (available
     at http://sec.gov/news/speech/2011/spch040411aa.htm).

January 1, 2007 through March 31, 2010' (the 'PCAOB Note'), BDO had determined that it cannot take on CBEH as an audit client. Indeed, BDO seemed to indicate that the PCAOB Note would prohibit any firm like BDO from taking on any audit assignments from companies (Chinese reverse merger companies, or CRMs) referenced in the Note.

## IX.   THE PRESUMPTION OF RELIANCE

164.   The market for China Integrated's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.  Throughout the Class Period:

(a)   The Company's common stock met the requirements for public listing and was listed and actively traded on the NASDAQ, a highly efficient market;

(b)   As a regulated issuer, China Integrated filed periodic reports with the SEC and the NASDAQ; .

(c)   China Integrated regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)   Securities analysts followed and published research reports regarding the Company that were publicly available to investors;

(e)   China Integrated securities were actively traded throughout the Class Period, with substantial trading volume and institutional investor participation; and

(f)   The market price of the Company's securities reacted promptly to the dissemination of public information regarding the Company.

165.   Accordingly, Plaintiffs and other members of the Class did rely and are entitled to have relied upon the integrity of the market price for the Company's securities and to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## X.   NO SAFE HARBOR

166.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to facts and conditions existing at the time the statements were made. No statutory safe harbor applies to any of Defendants' material false or misleading statements.

167.   Moreover, the statutory safe harbor is inapplicable with respect to the false and misleading statements including in the Company's financial statements, which purported to be prepared in accordance with GAAP.

168.   Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of China Integrated who knew that those statements were false when made.

## XI.   CLASS ACTION ALLEGATIONS RELATING TO ALL CLAIMS

169.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all

persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the common stock of China Integrated between March 31, 2010 through April 21, 2011, including persons or entities that purchased common stock pursuant and/or traceable to the Company's Registration Statement, effective May 19, 2010, and the Prospectuses issued in connection with the Company's Secondary Offerings on or about December 28, 2010 through January 7, 2011, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

170.  The Class is so numerous that joinder of all Class members is impracticable.  Throughout the Class Period, China Integrated common stock was actively traded on the NASDAQ, an efficient market.  As of March 12, 2011, there were 39,503,379 shares of China Integrated common stock outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171.  Plaintiffs' claims are typical of the claims of the members of the Class, because Plaintiffs' and the Class sustained damages as a result of the wrongful conduct in violation of federal law that is complained of herein.

172.  Plaintiffs will fairly and adequately protect the interests of the Class members and have retained Court-appointed counsel competent and experienced in class action and securities litigation.  Plaintiffs have no interests that are contrary to or in conflict with those of the Class members that Plaintiffs seek to represent.

173.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

174.  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether documents, including the Company's SEC filings, Registration Statement and Prospectuses, press releases and public statements made by Defendants during the Class Period contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether Defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(d)    whether the price of China Integrated's common stock during the Class Period was artificially inflated; and

(e)    the extent of damages sustained by Class members and the appropriate measure of damages.

175.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
#### For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against Defendants China Integrated, Gao, Pu, Li, And Goldman

176.   Plaintiffs repeat and reallege each of the allegations contained above as if fully set forth herein.

177.   This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants China Integrated, Gao, Pu, Li, and Goldman.

178.   During the Class Period, Defendants China Integrated, Gao, Pu, Li, and Goldman carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell China Integrated's securities at artificially inflated and distorted prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants China Integrated, Gao, Pu, Li, and Goldman, individually and as a group, took the actions set forth herein.

179.   Defendants China Integrated, Gao, Pu, Li, and Goldman, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of China Integrated as specified herein. Defendants China Integrated, Gao, Pu, Li, and Goldman employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of China Integrated's value and performance and continued substantial growth, which included the making of, or

1    the participation in the making of, untrue statements of material facts and omitting

2    to state material facts necessary in order to make the statements made about China

3    Integrated and its business operations and financial condition in light of the

4    circumstances under which they were made, not misleading, as set forth more

5    particularly herein, and engaged in transactions, practices and a course of business

6    that operated as a fraud and deceit upon the purchasers China Integrated common

7    stock during the Class Period.

8         180. Defendants China Integrated, Gao, Pu, Li, and Goldman had actual

9    knowledge of the misrepresentations and omissions of material facts set forth

10   herein, or acted with reckless disregard for the truth in that they failed to ascertain

11   and to disclose such facts, even though such facts were available to them. Such

12   defendants' material misrepresentations and/or omissions were done knowingly or

13   recklessly and for the purpose and effect of concealing China Integrated's financial

14   condition from the investing public and supporting the artificially inflated price of

15   its common stock. As demonstrated by the false and misleading statements during

16   the Class Period, Defendants China Integrated, Gao, Pu, Li, and Goldman, if they

17   did not have actual knowledge of the misrepresentations and omissions alleged,

18   were reckless in failing to obtain such knowledge by failing to take steps necessary

19   to discover whether those statements were false or misleading.

20        181. As a result of the dissemination of the materially false and misleading

21   information and failure to disclose material facts, as set forth above, the market

22   price for China Integrated's common stock was artificially inflated during the

23   Class Period. In ignorance of the fact that market prices of China Integrated's

24   publicly-traded common stock were artificially inflated or distorted, and relying

25   directly or indirectly on the false and misleading statements made by defendants,

26   or upon the integrity of the market in which the Company's securities trade, and/or

27   on the absence of material adverse information that was known to or recklessly

28   disregarded by defendants but not disclosed in public statements by defendants

during the Class Period, Plaintiffs and the other members of the Class acquired China Integrated's common stock during the Class Period at artificially high prices and were damaged thereby.

182. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding China Integrated's financial results and condition, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired China Integrated common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they paid.

183. By virtue of the foregoing, Defendants China Integrated, Gao, Pu, Li, and Goldman have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

184. As a direct and proximate result of the wrongful conduct of Defendants China Integrated, Gao, Pu, Li, and Goldman, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**
**For Violation Of Section 20(a) Of The**
**Exchange Act Against The Officer Defendants**

185. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

186. Defendants Gao, Pu and Li acted as controlling persons of China Integrated within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, Defendants Gao, Pu and Li had the power to

influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Defendants Gao, Pu and Li were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

187.  In particular, Defendants Gao, Pu and Li had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

188.  As set forth above, China Integrated and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Defendants Gao, Pu and Li are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII.  THE REGISTRATION STATEMENT AND PROSPECTUSES FOR THE SECONDARY OFFERINGS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT IN VIOLATION OF THE SECURITIES ACT

189.  China Integrated sold over 5.6 million shares of common stock at the inflated stock price of $7.00 per share, generating over $39.4 million for the Company through the Secondary Offerings sold pursuant to the Registration Statement and Prospectuses.  As alleged herein, the Registration Statement and

Prospectuses contained false and misleading statements, and also omitted material information necessary to make the statements made therein not misleading.

190. In connection with the Secondary Offerings, the Company filed with the SEC the Registration Statement on May 10, 2010, which was deemed effective by the SEC on May 19, 2010. Defendants Gao, Pu, Li, Goldman, Wang, and Guo each signed the Registration Statement.

191. On December 30, 2010, Defendants filed with the SEC the December Prospectus regarding the offering of 2,185,716 shares of the Company's common stock at $7.00 per share, together with warrants, exercisable for a six month period following the closing date, to purchase up to 1,092,858 shares of common stock.

192. On January 5, 2010, Defendants filed with the SEC the January Prospectus regarding the offering of 3,453,572 shares of the Company's common stock also at a price of $7.00 per share, along with 2,185,716 warrants to purchase a total of 1,726,786 shares of common stock.

193. The Registration Statement and the Prospectuses incorporated by reference the 2009 10-K financial statements. In the Registration Statement, Defendant Sherb, with their consent, were named by China Integrated as having audited and certified China Integrated's 2009 financial statements. With Defendant Sherb's knowledge and permission the 2009 financial statements were incorporated into the Registration Statement.

194. In the 2009 10-K, Defendants reported sales revenues of $289,572,053; costs of goods sold of $248,101,339; income from operation of $37,650,541; and net income of $37,870,963. As explained above (¶¶59-68), the 2009 financial statements were materially false and misleading when made because, as compared to the Company's SAIC filings, the Company's 2009 10-K financial reports materially overstated: (a) the Company's sales revenue, by $73.3 million (34%); (b) costs of goods sold, by $43.1 million (21%); (c) income from

1    operations, by $37.4 million (18786%); and (d) net income, by $37.7 million, by

2    29510%.

3        195.    The Prospectuses also incorporated by reference the materially false

4    and misleading 2009 10-K, 1Q 10-Q, 2Q 10-Q, and 3Q 10-Q described above

5    (¶¶71-100) concerning the overstated production and sales from the Company's

6    biodiesel factory.

7        196.    In addition, the Prospectuses disclosed the acquisition of the Shenmu

8    gas station and the Chongqing Tianrun biodiesel factory in October 2010, but

9    omitted to disclose the related-party transactions with Defendant Gao's son, Gao

10    Bo, as described above (¶¶109-121).

11        197.    In addition, in the Registration Statement, Defendant Sherb consented

12    to the incorporation of their "Report Of Independent Registered Public Accounting

13    Firm" ("Audit Report") dated March 30, 2010, relating to the consolidated

14    financial statements filed in the 2009 10-K.    With respect to the 2009 financial

15    statements, Defendant Sherb's Audit Report stated that Sherb "conducted our

16    audits in accordance with the standards of the Public Company Accounting

17    Oversight Board (United States) . . . . In our opinion, the financial statements

18    referred to above present fairly, in all material respects, the financial position of

19    China Integrated Energy, Inc. and subsidiaries as of December 31, 2008 and 2009,

20    and the results of its operations and its cash flows for each of the years in the two-

21    year period ended December 31, 2009 in conformity with accounting principles

22    generally accepted in the United States of America."

23        198.    Given the magnitude of the discrepancies between the revenues and

24    net income in the Company's Chinese SAIC filings compared to the SEC filings,

25    Defendant Sherb, who consented to the inclusion of its opinions in the Registration

26    Statement, negligently failed to perform its 2009 audits of China Integrated in a

27    reasonable manner; did not comply with the standards of the Public Company

28    Accounting Oversight Board ("PCAOB"); and, thus, its audit did not constitute a

reasonable investigation of whether the Company's financial statements were presented in compliance with GAAP.

## XIV.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III
### For Violation Of Section 11 Of The
### Securities Act Against All Defendants

199.  Plaintiff Bristol Investment repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of Defendants to defraud Plaintiff Bristol Investment and other members of the Class.  For purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

200.  This Count is brought pursuant to Section 11 of the Securities Act and is asserted by Plaintiffs against all Defendants by, and on behalf of, the class who acquired shares of the Company's common stock pursuant to or traceable to the Registration Statement and Prospectuses issued in connection with the Company's Secondary Offerings, and predicated upon the liability of the Defendants named in this Count for making false and materially misleading statements and omissions therein.

201.  As set forth above, the Registration Statement and Prospectuses contained untrue statements of material fact, including the financial statements of China Integrated.  In addition, the Registration Statement and Prospectuses omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including China Integrated's violations of GAAP.  The facts misstated and omitted would have been material to a reasonable person reviewing the Offering Documents.

202.   China Integrated was the registrant of the Offering and the issuer of the stock issued via the false Registration Statement and Prospectuses.  As such, China Integrated is strictly liable for each false and misleading statement contained therein.

203.   Defendants Gao, Pu, Li, Goldman, Wang and Guo are signatories of the Registration Statement and, therefore, each of these Defendants had a duty to make a reasonable investigation of the statements contained in the Registration Statement and Prospectuses to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading.  In the exercise of reasonable care, Defendants Gao, Pu, Li, Goldman, Wang and Guo should have known of the material misstatements and omissions contained in the Registration Statement and Prospectuses and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  As such, each of these Defendants is liable to Plaintiff and the Class.

204.   In connection with the Secondary Offerings, Defendant Sherb, with their consent, were named by China Integrated as having audited and certified China Integrated's 2009 financial statements. With Defendant Sherb's knowledge and permission the false and misleading 2009 financial statements were incorporated into the Registration Statement and Prospectuses.  As a result, Defendant Sherb is liable pursuant to Section 11(a)(4), 15 U.S.C. § 77k(a)(4).

205.   Defendants did not make a reasonable investigation of the statements contained and incorporated by reference in Registration Statement and Prospectuses, and did not possess reasonable grounds for believing that the Registration Statement and Prospectuses did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

206.   By reason of the conduct alleged herein, each of the Defendants named in this Count violated, and/or controlled a person who violated Section 11 of the Securities Act.   As a direct and proximate result of these Defendants' wrongful conduct, the price for the China Integrated common stock sold in the Secondary Offerings were artificially inflated and Plaintiff Bristol Investments and the Class suffered substantial damages in connection with their purchases of China Integrated common stock in or traceable to the Secondary Offerings.

207.   Plaintiff Bristol Investments and other members of the Class who acquired their China Integrated stock in the Secondary Offerings did not did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts contained or incorporated in the Registration Statement and Prospectuses when they purchased or acquired the shares.   The value of the shares sold in the Secondary Offerings has declined substantially due to violations of Section 11 of the Securities Act by the Defendants named in this Count.   Plaintiff Bristol Investments and the other members of the Class were thus damaged by Defendants' misconduct and by the material misstatements and omissions of the Offering Documents.

208.   This action was brought within one year after the discovery of the untrue statements and omissions and within three years after the Secondary Offerings.

209.   By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiff Bristol Investment and all member of the Class who purchased or otherwise acquired shares of China Integrated common stock pursuant or traceable to the Secondary Offerings.

## COUNT IV
### For Violation Of Section 15 Of The
### Securities Act Against The Officer Defendants

210.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of Defendants to defraud Plaintiff Bristol Investment or other members of the Class.  For purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaims any claim of fraud or intentional misconduct.

211.   This Count is brought pursuant to Section 15 of the Securities Act and is asserted by Plaintiffs against the Officer Defendants (Defendants Gao, Pu and Li) by, and on behalf of, the class who acquired shares of the Company's common stock pursuant to or traceable to the Registration Statement and Prospectuses issued in connection with the Company's Offering, and predicated upon the liability of the Defendants named in this Count for making false and materially misleading statements and omissions therein.

212.   Throughout the Class Period, each of the Officer Defendants was a controlling person of China Integrated within the meaning of Section 15 of the Securities Act.  By reason of each Officer Defendants' stock ownership, senior management positions at the Company, as alleged above, these defendants, individually acting pursuant to a common plan, had the power to influence and exercised the same to cause China Integrated to engage in the unlawful acts and conduct complained of herein.

213.   As set forth above, each Defendant violated Section 11 by such Defendants' acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, each of the Officer Defendants is liable pursuant to Section 15 of the Securities Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff Bristol Investments and the other

members of the Class suffered damages in connection with their acquisition of China Integrated common stock pursuant or traceable to the Secondary Offerings.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   Determining this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as class representative and Lead Counsel as Class Counsel;

B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Awarding such other and further relief as the Court may deem just and proper.

## XVI.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: December 20, 2011

Respectfully submitted,

ABRAHAM, FRUCHTER
& TWERSKY, LLP

*Takeo A. Kellar*

TAKEO A. KELLAR

ABRAHAM, FRUCHTER
& TWERSKY, LLP
IAN D. BERG  (Bar No. 263586)
TAKEO A. KELLAR  (Bar No. 234470)
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 792-3448
Fax:   (858) 792-3449
*iberg@aftlaw.com*
*tkellar@aftlaw.com*

-and-

MITCHELL M.Z. TWERSKY
ATARA HIRSCH
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655
mtwersky@aftlaw.com

*Counsel for Lead Plaintiff Puerto Rico
Teachers Retirement System*

WILLIAM B. FEDERMAN (*Pro Hac Vice*)
FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Tel:   (405) 235-1560
Fax:   (405) 239-2112
wbf@federmanlaw.com

*Counsel for Plaintiffs Bristol Investment
Fund, Ltd.*

## PROOF OF SERVICE VIA OVERNIGHT DELIVERY

I am employed in the County of New York, State of New York.  I am over the age of eighteen (18) years and not a party to the within action.  My business address is One Penn Plaza, Suite 2805, New York, New York 10119.

On December 20, 2011, I served the following documents described as:

1.    Consolidated Complaint

on counsel for the party in this action, addressed as stated below:

| | |
|---|---|
| Eugene R Licker | Walter Allan Edmiston |
| Laura M Vasey | Loeb & Loeb |
| Loeb & Loeb LLP           -and- | 10100 Santa Monica Blvd Ste 2200 |
| 345 Park Avenue 18th Floor | Los Angeles, CA 90067-4164 |
| New York, NY 10154 | |

*Counsel For Defendant China Integrated Energy, Inc.*

Jon P. Kardassakis
Lewos Brisbois Bisgaard & Smith LLP
221 North Figueroa Street, Suite 1200
Los Angeles, California 90012

*Counsel For Defendant Sherb & Co.*

Larry Goldman
5 Victory Road
Suffern, New York 10901

*Defendant Larry Goldman*

**By Federal Express**: By placing a true and correct copy thereof in a box, which I deposited with an official Federal Express mailing center on December 20, 2011, for delivery overnight.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 20th day of December, 2011, at New York, New York.

_Jamie Leal_
Jamie Leal

Proof of Service
Case No. 11-02559-MMM-PLA