1  JEFFREY S. KRAVITZ, SBN 66481
   jskravitz@foxrothschild.com
2  JACQUELINE LECHTHOLZ-ZEY, SBN 279074
   jlechtholzzey@foxrothschild.com
3  PETER C. BUCKLEY (Pro Hac Vice)
   pbuckley@foxrothschild.com
4  FOX ROTHSCHILD LLP
   1800 Century Park East, Suite 300
5  Los Angeles, CA 90067-1506
   Telephone:  310-598-4150
6  Facsimile:   310-556-9828

7  Attorneys for Defendants
   LARRY GOLDMAN, ALBERT PU, and
8  WENBING CHRISTOPHER WANG

9  [Additional Counsel listed on signature page]

10                  **UNITED STATES DISTRICT COURT**

11      **FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

| | |
|---|---|
| 13  LARRY BROWN, Individually and on Behalf of All Others Similarly Situated, | CASE NO. CV 11-02559-BRO (PLAx) |
| 14 | Hon. Beverly Reid O'Connell |
| 15        Plaintiffs, | **CHINA INTEGRATED DEFENDANTS' JOINT SUPPLEMENTAL MEMORANDUM OF LAW** |
| 16    vs. | |
| 17  CHINA INTEGRATED ENERGY, INC., et al., | Date Complaint Filed:  12/20/11 |
| 18        Defendants. | Discovery Cutoff:  8/4/14<br>Trial Date:  10/21/14 |

At the Court's direction, Defendant China Integrated Energy, Inc. and the Individual Defendants (Pu, Goldman, Wang, Gao, Li, and Guo) submit this supplemental memorandum in support of their motion to exclude the declarations and testimony of Michael A. Marek and Kenneth W. McGraw and in opposition to Plaintiffs' motion for class certification.

## I. ARGUMENT

The pending motions involve two of the Court's most important "gatekeeping" functions—first, admission of expert testimony and, second, certification of a class. Here, Plaintiffs have the burden of proof on each, and in each case they have failed to meet that burden.

### A. Mr. Marek's testimony underscores his lack of true qualifications, confirms the unreliability of his purported test, and demonstrates that his opinion on market efficiency cannot be trusted.

Mr. Marek's evasive and self-contradictory testimony confirmed that he is expert only at being an expert. When asked to explain his criteria for event selection (one of the central components of his event study), Mr. Marek refused to provide a straight answer. In one breath, Mr. Marek testified that he selected "information … that … could possibly be construed as material to investors" (N.T. 14:19-20). At his deposition, he "defined events to be considered as [information] that would reasonably be believed to have some effect on the value of the security". (N.T. 11:11-14 and Marek Dep. 91:2-15). At another moment, he admitted choosing events that he "thought would impact the price". (N.T. 39:17-19). If the criterion was information that "could possibly" be material, how could Mr. Marek legitimately exclude the Axler Report, when it raised the same questions and concerns as those raised later by Sinclair Upton and Alfred Little? Mr. Marek's criteria are, to be blunt, outcome determinative and cannot be trusted. Even Mr. McGraw disagreed with him 50% of the time. *See* Dr. Roper Dec. at ¶70-75. As such, Mr. Marek's test fails *Daubert*. *See Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (U.S. 1993); *see also City*

1  *of Pomona v. SQM North America Corp.*, 2014 WL 1724505, *6 (9th Cir. 2014)
2  ("Under *Daubert*'s testability factor, the primary requirement is that '[s]omeone else
3  using the same data and methods ... be able to replicate the result[s].'").

4       Just as his criteria are ever changing, so too are Mr. Marek's stated reasons for
5  excluding the Axler Report.  At the hearing, he offered two new reasons: that Axler
6  did not conduct an investigation or offer any evidence.  (N.T. 18:8-19).  Both
7  purported reasons are inconsistent with his deposition testimony (wherein he
8  distinguished the report as a "blog … [that] was not picked up on nearly the same
9  fashion as the later analyst reports", Marek Dep. 241:4-13), and neither makes any
10 sense.  Like Sinclair Upton and Alfred Little, Axler compared the company's SEC and
11 SAIC filings and raised serious questions about the accuracy of its biodiesel reporting
12 with reference to industry norms, third-party data, and what appears to be his own
13 investigation.

14       Mr. Marek attempts to mask his flawed approach and lack of true qualifications
15 by repeatedly reaching for support in statistical jargon and mathematical complexity,
16 which he contends allow him to opine with complete and utter infallibility (referring
17 to his "100% confidence level").  (N.T. 29:11-15).  Consider the following testimony:

18       Q:    How do you find the SAIC filings?
19       A:    You click on the China – it's – SAIC is basically the
20           SEC of China, and it's the same type of system where
21           information is available to investors who go to look for it.
22       Q:    Have you ever gone onto the SAIC's website and
23           looked for information, sir?
24       A:    No, I have not.
25 (N.T. 24:24-25:5).  In fact, SAIC filings are not available on the SAIC's website.  (*See*
26 http://www.saic.gov.cn/english/Home/, last accessed June 28, 2014).

27       When considering Mr. Marek's test, consider the following:

28

- Mr. Marek selected 17 events that he believed would impact the price of China Integrated stock in an efficient market, and only 7 times did that actually happen; and
- Mr. Marek's test allows him to conclude that the market was efficient even if the stock always moved in the wrong direction (N.T. 32:18-22)—described by Dr. Roper as a test for chaos, not market efficiency (N.T. 92:1-20).

Just as in *IBEW* where Mr. Marek failed to consider the German market among other fatal oversights, the flaws in Mr. Marek's methodology are the sort of oversights that an unqualified expert commits yet fails even to realize. Plaintiffs' argument that the *IBEW* oversights are not at play here misses the point. Mr. Marek simply lacks the qualifications necessary to provide a reliable expert opinion under *Daubert*. The Court should reject his testimony and Plaintiffs' attempt to prove an efficient market through his purported expert opinion.

**B. Mr. McGraw's testimony likewise underscores his lack of true qualifications, confirms the unreliability of his purported test, and demonstrates that his opinion on market efficiency cannot be trusted.**

A seasoned expert on other topics not relevant to this case, Mr. McGraw fought less with the questions, but nevertheless demonstrated that he is likewise not qualified, nor capable of performing a test without the "black box" of his years of experience to hide the flaws.

Plaintiffs' redirect examination provides an accurate summary of their "everyone's doing it" approach to Mr. McGraw's qualifications:

> Q: Mr. McGraw, have you had occasions other than this case and the Waste Management case to determine the efficiency of the market for a particular stock?
>
> A: No, sir.
>
> \* \* \*

4

| | |
|---|---|
| 1 | Q: Have you ever been found not to be qualified to |
| 2 | testify as an expert? |
| 3 | A: No, sir. |

(N.T. 78:3-13). In short, Plaintiffs argue that this Court should be persuaded that Mr. McGraw has the necessary qualifications simply because no Court has ever denied him the opportunity to testify on any subject. Of course, Plaintiffs fail to mention that Mr. McGraw's qualifications were not challenged in *Waste Management*, his only relevant prior experience. In assessing Mr. McGraw's qualifications, consider the following:

- When pressed about his dearth of relevant experience, Mr. McGraw cites passing conversations with other colleagues about matters that he cannot recall—even by name—as somehow qualifying him to opine here (N.T. 68:1-25); and
- Although he has allegedly read "many articles and many event studies", Mr. McGraw could not recall the name of even one article or publication about the use of an event study to test for market efficiency (N.T. 69:4-11).

A true expert does not rely on passing conversations (especially ones that he cannot recall) to prove his worth, and can identify by name at least some of the relevant literature in his field.

Perhaps recognizing that he cannot support his flawed event study without Cynthia Jones at his side, Mr. McGraw repeatedly turns to *Cammer* and *Krogman* for cover—finding none. In one breath, he says that the *Cammer* and *Krogman* factors are "part of [his] background as an investment banker and a person who has worked in the financial markets". (N.T. 69:15-19). In another, he cannot say for sure whether he has even read the decisions—testifying both that "I did not read the case, as I recall" (N.T. 74:18-24) and "Yes, sir, [I read the *Cammer* case]" (N.T. 75:3-4) within two pages of transcribed testimony. Mr. McGraw may be an expert on other subjects, but

he is not an expert at using event studies to test for market efficiency—as proof, consider that he is more than willing to adopt Court-sponsored factors as his economic test (N.T. 69:4-12) despite the fact that economists disagree that those factors provide any objective threshold.

By comparing Mr. McGraw's report in *Waste Management* to his report here, it becomes clear that, like Mr. Marek, Mr. McGraw is outcome-oriented and determined to satisfy his client's objectives. In *Waste Management*, Mr. McGraw was asked to rebut an allegation that his clients' accounting improprieties caused the stock price to drop. (N.T. 75:7-15). After conducting an event study with Mr. Marek's help, Mr. McGraw opined that the "accounting improprieties alleged by the SEC were not indicative of damage to the shareholders"—a conclusion that supported his clients' defense. (N.T. 75:21-25). During his deposition in *Waste Management*, Mr. McGraw explained that it was necessary to look past the numbers and undertake an extensive analysis of the background of the company and its history to properly interpret the results of the event study:

> "[I]t should not be a mathematical analysis. It's a mathematical or statistical analysis *enhanced by an understanding* of what was going on in the market and what the market as manifest by analysts' commentary, what the market was aware of regarding Waste Management."

(McGraw WM Dep. at 71:15-21)[1]. There, Mr. McGraw explained that "you need the background data" to understand the results of the event study. (McGraw WM Dep. at 94:7-10). Here, Mr. McGraw looked only at the numbers—seven out of twelve—and the *Cammer* and *Krogman* factors before concluding that the market was efficient, conceding that he did not do anything like the detailed analysis of background and

---

[1] Mr. McGraw's *Waste Management* Deposition is available through PACER—Case No.1:02-cv-02180, Document No. 312-5 (filed on March 3, 2006). Defendants did not attach the transcript here so as not to burden the Court with a voluminous filing, but will provide the Court with a copy upon request.

1  history that he performed in *Waste Management*. (N.T. 76:6-7).

2  Mr. McGraw's lack of basic experience testing for market efficiency using an event study is apparent in his failure to recognize and analyze a critical fact. As Dr. Roper testified, a market can only be efficient if it "rapidly and fully reflect[s] publicly available information". (N.T. 92:2-3). Mr. McGraw included the earlier Axler Report and the later Sinclair Upton Report as events in his event study. Although both Reports raised the same issues and concerns, Mr. McGraw's regression shows that the stock did not react in a statistically significant way until the later Sinclair Upton Report was published. Mr. McGraw fails to analyze or explain how the market could be efficient, but take several months to react to information that Mr. McGraw believed would affect the stock price. Mr. McGraw chose not to consider this evidence of market inefficiency that is evident in his analysis.

Mr. McGraw's brief foray in *Waste Management* and peripheral involvement in unidentified other matters at CFC Capital does not qualify him to employ an event study to test for market efficiency here. And his purported test relies far too heavily on his "I know it when I see it"—seven out of twelve is enough—approach to satisfy *Daubert*. Like Mr. Marek, the Court cannot rely upon Mr. McGraw to provide an expert opinion worthy of consideration and should reject his testimony and along with it deny Plaintiffs' bid for class certification.

### C. *Halliburton* does not save Plaintiffs on either motion, but it does provide yet another reason to deny class certification.

The Supreme Court's holding in *Halliburton Co. et al. v. Erica P. John Fund, Inc.*, 573 U.S. ___, 2014 WL 2807181 (June 23, 2014), reaffirmed Plaintiffs' burden of proving market efficiency to obtain the benefit of the class-wide rebuttable presumption of reliance set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Insofar as Plaintiffs lack admissible expert testimony on the subject and have not carried their burden of proving market efficiency in any event, *Halliburton* has no practical effect on the pending motions—which should be decided in Defendants'

favor.

*Halliburton* only comes into play if the Court finds that Plaintiffs have proven market efficiency and therefore are entitled to the rebuttable presumption of the element of reliance. In that case, *Halliburton* allows Defendants to rebut the presumption of reliance by demonstrating at the class certification stage "that [the] alleged misrepresentation[s] did not actually affect the market price of the stock"—for example, by showing that the price did not meaningfully respond when the "truth" was revealed. *Id*. at *17. In this case, Defendants have carried that burden.

The regressions conducted by both of Plaintiffs' purported experts show that the price of China Integrated's stock did not move in a statistically significant manner in response to the Axler Report's allegations about SEC/SAIC discrepancies and inflated biodiesel production figures. (Marek Report at Exhibit K and McGraw Report at ¶34). As Dr. Roper testified: "So on December 1st [the date of the Axler Report], there's no evidence that the stock price changed … They have a cause, but they have no effect". (N.T. 94:21-95:2). Dr. Roper discusses the absence of price impact in further detail in paragraphs 133 through 141 of his report.

That the alleged misrepresentations did not actually affect the market price of China Integrated's stock is not surprising considering the following evidence obtained in discovery:

- Rodman & Renshaw, the placement agent for China Integrated's Secondary Offering and one of the analysts identified by Plaintiffs in their analysis of *Cammer* factors, read and assessed the Axler Report, yet purchased CBEH shares nevertheless. *See* Kessler Dep. at 13:14-23 (Dkt. No. 215-12).

- After Seeking Alpha published the Axler Report, NorthPointe (Lead Plaintiff PRTRS's investment advisor) continued to buy CBEH even after it digested the allegations of fraud because "NorthPointe did not

conclude that China Integrated had met its sell discipline". *See* Wilk Dep. at 68:21-69:4 (Dkt. No. 215-3).

The only evidence of record thus demonstrates that the alleged misrepresentations at issue in this case did not impact the price of CBEH. For this reason, *Halliburton* provides yet another reason why Plaintiffs' motion for class certification should be denied. Nevertheless, should the Court disagree on the basis of the evidence of record, Defendants respectfully request the opportunity to submit a supplemental expert report on lack of price impact before the Court rules on Plaintiffs' motion for class certification.

## III. CONCLUSION

Mr. Marek and Mr. McGraw should be excluded because they fail to meet the admissibility standards under *Daubert* and therefore the Court should deny Plaintiffs' motion for class certification.

Dated: June 30, 2014            Respectfully submitted,

                                FOX ROTHSCHILD LLP

                                */s/ Peter C. Buckley*
                                PETER C. BUCKLEY
                                JOSHUA HORN
                                CHRISTINE SOARES
                                2000 Market St.
                                20th Floor
                                Philadelphia, PA 19103-3222
                                Tel: (215) 299-2854
                                Fax: (215) 299-2150
                                pbuckley@foxrothschild.com
                                jhorn@foxrothschild.com
                                csoares@foxrothschild.com

                                        -and-

JEFFREY S. KRAVITZ
JACQUELINE LECHTHOLZ-ZEY
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
Tel: (310) 598-4150
Fax: (310) 556-9828
jskravitz@foxrothchild.com
jlechtholzzey@foxrothschild.com

*Attorneys for Defendants Larry Goldman, Albert Pu, and Wenbing Christopher Wang*

LOEB & LOEB LLP

*/s/ Eugene R. Licker*
EUGENE R. LICKER
JOHN A. PISKORA
WOOK HWANG
345 Park Avenue
New York, NY 10154
Tel:   (212) 407-4000
Fax:   (212) 407-4990
*elicker@loeb.com*
*jpiskora@loeb.com*
*whwang@loeb.com*

-and-

W. ALLAN EDMISTON
AMANDA J. SHERMAN
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Tel:   (310) 282-2000
Fax:   (310) 282-2200
*aedmiston@loeb.com*
*asherman@loeb.com*

*Attorneys for Defendants China Integrated Energy, Inc., Xincheng Gao, Gaihong Li, and  Junrong Guo*